255 N.J. Super. 616 (1992)
605 A.2d 1125
T.L., PLAINTIFF-APPELLANT,
v.
TOYS `R' US, INC., A CORPORATION, DON BAYLOUS, AND JEFFREY WELLS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1992.
Decided April 16, 1992.
*619 Before SHEBELL, SKILLMAN and D'ANNUNZIO, JJ.
Fredric J. Gross argued the cause for appellant (Fredric J. Gross, on the brief and reply brief).
James R. Williams argued the cause for respondents (Greenberg & Epstein and Jackson, Lewis, Schnitzler & Krupman, attorneys; James R. Williams and Scott T. Baken, of counsel and on the brief; Ina B. Lewisohn, of counsel).
Nadine Taub submitted a brief on behalf of amicus curiae Women's Rights Litigation Clinic, Rutgers University School of Law.
The opinion of the court was delivered by SHEBELL, J.A.D.
In this appeal we are called on to determine whether the alleged unwelcome sexual conduct towards and harassment of this plaintiff by her male supervisor constituted sexual discrimination entitling her to compensatory and punitive damages. We must also decide whether the supervisor's employer should also be held liable. The Law Division judge in a non-jury trial found that the supervisor's liability was limited to a single nonconsensual touching of plaintiff that constituted a battery. The judge awarded $5,000 in compensatory damages, but denied punitive damages "because there is no evidence that [the supervisor] acted with malice toward plaintiff." The judge dismissed all claims against plaintiff's employer. We reverse and remand.
On August 27, 1987, plaintiff, T.L., commenced a civil action in the Law Division against her former employer, Toys `R' Us, *620 Inc. (Toys `R' Us), and Don Baylous, plaintiff's supervisor. She alleged injuries and damages resulting from defendants' violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e to 2000e-17. She also claimed tortious violations of her "body and person" as a result of alleged assaults and improper conduct in the workplace during her employment by Toys `R' Us. She further alleged intentional interference by Baylous with her contractual relationship with Toys `R' Us, and negligence in defendants' conduct towards her while she was an employee. She asserted that sexual harassment perpetrated and condoned by the defendants caused her to suffer damages including loss of wages, pension benefits, anxiety, detriment to her health, medical expenses, humiliation, and pain and suffering, and also that she was required to expend attorneys' fees, and costs of suit.
Plaintiff filed an amended complaint on March 23, 1988, wherein she deleted reference to her claims being based in part on Title VII. She filed a second amended complaint on August 25, 1989, adding Jeffrey Wells as a party defendant. Plaintiff alleged that, as supervisor of the Human Resources Department of Toys `R' Us, Wells directed that plaintiff participate in a face-to-face encounter with defendant, Baylous, causing her lasting psychological harm. She asserted that Toys `R' Us ratified Wells' intentional and malicious wrongful acts all in violation of the LAD.
The trial, conducted over six days from June 6 through June 14, 1990, revealed that plaintiff began her employment with Toys `R' Us in August 1981 as a file clerk in the Purchasing Department. Through various promotions she worked her way up to supervisory positions, including Data Entry Supervisor and then Purchase Order Management Supervisor. Plaintiff held this position in November 1985 when Baylous joined Toys `R' Us as Director of Purchasing Administration. In that capacity Baylous supervised approximately thirty people, including plaintiff. Plaintiff received favorable evaluations and *621 promotions under his supervision. She was promoted to Systems Analyst for the Purchasing Department in September of 1986, and was in close contact with Baylous on a daily basis, and at least once a week met with him in his office.
Plaintiff, then twenty-seven years of age, noticed what she considered to be offensive sexual conduct by Baylous directed against other female employees in December 1986. However, the first incident complained of as personally involving plaintiff occurred around January 21, 1987. She testified:
Don told me that I should show the order to Frank Pissani. And I remarked that I knew how upset Frank could get when his orders reject especially a three-hundred page Mattel order.
....
And Don said, well, just lean over his desk and show him your tits, implying that that way Frank couldn't get upset at me.
When asked how she felt when he said this, she stated:
Well, I left the office and headed toward Frank, and all I kept thinking is how weird. That's disgusting that that man would say that to me.
Plaintiff stated that she did not say anything to Baylous for using that kind of language, adding, "I never said anything to Don. I was afraid that I could lose my job."
The next sexually offensive incident plaintiff allegedly witnessed was when she and two other female workers were in Baylous' office, and he noticed that one of the women had worn a dress to work in the morning and changed into jeans after lunch. She stated that "Don put his hands on [the woman's] waist and asked her if she had gone home for a quickie." She explained "[h]e put his hands on her waist and kind of squeezed as he said it, and we all left the office." Plaintiff testified that the woman did not say anything to Baylous.
Plaintiff related that the next incident she remembered, also apparently occurring in January 1987, was when she had a meeting with Baylous. She testified that after the meeting was concluded:
Don stood up walked around his desk and stood by the door. I rose and went to my right a little, and I noticed something out of the corner of my eye out of the *622 window, and I said, what's going on out there? At this, Don lifted the back of my shirt up over my shoulders. I know my bra strap was exposed, and said, give them a show. And I pulled my shirt down, ran out of the office crying, and I remember running to M.P.
Plaintiff indicated that although she saw scaffolding outside the window and assumed window washers were present, she failed to actually see anyone. Plaintiff worked until the end of the day, although she indicated that she was crying and quite upset. Plaintiff produced other witnesses who testified about her condition immediately following the incident. Plaintiff did not report the incident to any superior or manager at Toys `R' Us.
The next occurrence was within a short time thereafter. Plaintiff and Baylous were discussing the fact that Baylous was going to get a new boss reputed to have a quick temper. Plaintiff recounted that she said: "[T]hat's all we need, is somebody else with a quick temper, because that makes me nervous." She asserted that Baylous replied: "[W]ell, just stick your tits out at him as if you're brave and act as if you're brave." She described her reaction thus: "Once again, I just got upset, and I don't remember anything except leaving the office." Despite Baylous' comments, plaintiff did not express her distaste, nor did she tell him to stop using that language, explaining: "I was really afraid of Don. I didn't know what would happen if I said something."
She further recounted that around the same time while in her cubicle she saw defendant squeezing a female co-employee's knee. She remembered that the woman pushed his hand away, and that afterwards the woman told her that "she really hated for Don to touch her and especially there because she hated to be touched on the knee."
On January 21, 1987, according to plaintiff's testimony, she and a co-worker were with Baylous at a meeting, when he told plaintiff "[t]o write a memo to cover [her] ass, and then he added because you have such a cute little ass." She said nothing to Baylous about the comment, but the following day *623 plaintiff went to talk to Baylous' immediate boss, Bill Frankfort, about the incident. Plaintiff was disappointed with the meeting, however, because Frankfort told her not to tell Howard Moore, the Executive Vice President in charge of Purchasing, as he was very straight-laced and a family man and "[h]e also told me to handle it myself." Plaintiff remembered telling Frankfort that she would try, but she really did not think that she could because she had not been able to tell Baylous how she felt up to that time. On January 26, 1987, plaintiff wrote a letter to Frankfort concerning her complaints of sexual harassment. She handed the letter to him in an envelope that same day. However, it appears that Frankfort did not open the letter until after plaintiff left the employ of Toys `R' Us in April 1987.
Plaintiff, on January 26, 1987, received a call to report to Eric Jonas, Manager of Employee Relations for Toys `R' Us. At the meeting, plaintiff and a female co-worker, who was present when plaintiff arrived, told Jonas "about the trouble we were having with Don." Plaintiff stated, "I told him the specific incidents of what had happened with me with Don." She stated, "we gave him a list of names of other women who had either themselves said something  you know, had come to us talking about Don also." She recalled at trial approximately six or seven names that she had given to Jonas as women who were offended by Baylous' touchings or remarks since the department Christmas party in 1986.
Plaintiff told Jonas that she did not want Baylous fired, but just "wanted it stopped." Jonas informed plaintiff that the problem would be more difficult to handle because plaintiff did not want Baylous to know that she had complained. Jonas assured plaintiff, however, that "he could handle it by saying that someone had complained, and that should be enough to make him stop." A few days later, plaintiff met Frankfort in the hall. He told her that Baylous had been spoken to. Plaintiff felt relieved and "figured, good, this is going to be the end of this and that's it."
*624 Plaintiff testified that to her amazement around February 3 or 5, 1987, she was in the office with Baylous having a meeting and
I wasn't feeling very well. And I looked pretty horrible, and I had said to Don  he had asked me what was the matter. I said I feel like I'm going to pass out. If I pass out, would you kick me into the hall. Something to that effect. And he said 
....
He said if I passed out, he would take advantage of me.
Plaintiff said that she became upset because she thought if this man was spoken to "[w]hy is he saying this to me?" The next day plaintiff again went to see Jonas and told him of Baylous' remark. She stated that Jonas told her to keep a journal of anything else that happened. She testified that she also told Jonas of a remark Baylous made to her female co-worker that the co-worker had a cute "rump" or "bump." She testified that after her meeting with Jonas she was out sick for approximately one week but that her sister, who also worked at Toys `R' Us, informed her that "Don came up behind her and rubbed her shoulders while she was on the phone."
During the first week of March, 1987, plaintiff went to Frankfort to tell him that she did not believe that Baylous "had stopped." Plaintiff again reported to Jonas on March 9 and informed him that she was still very uncomfortable because "I felt like if Don had been warned, why did he continue this, why did he make a comment about [co-worker] and why did he say he'd take advantage of me if I passed out." She stated that Jonas told her that she was paranoid and "that it would be worse for me in another job...."
Plaintiff also told Jonas that her husband and father were very upset about how concerned she was and had recommended that she resign. Jonas allegedly advised plaintiff not to resign until she received her bonus check. Jonas also offered to transfer her within the company. She informed Jonas that she did not feel she should have to be transferred because she *625 worked hard in her department for the past six years and loved her job. She told him that she had not done anything, and, therefore, was not the one who should be transferred. Plaintiff pointed out to Jonas that another employee who had transferred had to wait a long time, and stated, "I don't think that I could physically or emotionally stay in the department much longer."
Plaintiff testified that on March 11, 1987 she was standing in the data-entry office when Baylous walked down the hall, leaned over a low wall, and grabbed a female employee on the arm. She said the woman just pulled away, but "I remember it bothered me." Then, "[t]he next day, Don grabbed me on the arm." She recounted that later on in the afternoon she saw Don "put his hand on [a female employee's] shoulders and squeezed, and then at the same time, let go of [her arm] and grabbed [another woman's] arm and he was saying, oh, you're not going home yet." Plaintiff related that on March 27, 1987, she and Baylous were meeting with another supervisor, and Baylous began the meeting by saying "that the reason [he] and [the other woman] had colds was not because they had been cohorting or cohabitating...."
Plaintiff stated that on April 6 she went to Howard Moore, an Executive Vice-President of Toys `R' Us, because she was upset that Jonas had called her paranoid and Frankfort was talking to others about her. She told Moore that she felt she "was being forced to leave the company." She stated that she told him everything and that he was upset that this was going on without him knowing about it. She recounted that Moore attempted to contact defendant Jeffrey Wells, head of personnel, but that Wells was at a conference in Florida.
According to plaintiff's testimony, she was called to the Personnel Department later that day to meet with Laurie Lambert. She proceeded to tell Lambert everything that had occurred. Lambert told her that she could have a transfer, but plaintiff again questioned "why should I have to transfer when *626 I worked so hard for this job that I love after six years of being in this company?" On the morning of April 7, plaintiff gave two-weeks notice to Baylous that she was leaving. He wanted to know why she was leaving. Plaintiff told him it was for personal reasons because she wanted to leave peacefully without having to deal with him knowing it was her.
Later that afternoon plaintiff was summoned again to Lambert's office and was informed that Howard Moore had demanded an investigation and that "he thought [plaintiff] should confront [Baylous] with the problem." Plaintiff was also told that she was summoned because Lambert wanted to offer her a transfer. The personnel employee in charge of transfers was also present in the room.
Plaintiff recounted that a few minutes later there was a knock on the door, and it was Baylous. She felt trapped and became very upset. She told Baylous everything that she had been complaining about "for this period of time from December until April of 87." She testified: "[H]e apologized in the beginning. Then he started to deny things, but I do remember him saying that he would try to keep his hands in his pockets." She said he denied the sweater incident, and she remembers him becoming more and more angry, and she became hysterical.
Plaintiff maintained in her testimony that she could not return to work after the confrontation. She declared "that they took a hostile work environment and made it even worse." Plaintiff claimed that she felt she could not work at Toys `R' Us anymore because of the confrontation forced upon her. Following her departure from Toys `R' Us, plaintiff collected unemployment benefits despite the objection of her former employer. Plaintiff remained unemployed until February 1988, when she began to work for a business owned by her neighbor where she was the only employee.
Although plaintiff had no psychiatric care, she was sent to a psychologist by her attorney for evaluation in 1989. The psychologist diagnosed her condition as "a simple phobia" that *627 could be cured through psychotherapy. He attributed her problem to conditions in the workplace that he concluded amounted to sexual harassment. The psychologist further explained that her "phobia" resulted not only from the direct involvement or touchings of plaintiff by Baylous, but also from her seeing similar events involving her co-workers. He testified:
It may not be that it was herself that was being touched and violated at that point, but after she experienced the personal invasion, after she was either touched or remarks were made against her, hearing about those remarks, hearing that they are continuing, seeing other people being touched, hearing about other people being touched, certainly contributes to the continued feeling of being uncomfortable in that atmosphere.
The psychologist related that the Personnel Department contributed to plaintiff's mental condition because it failed to effectively deal with the problem. The psychologist testified that "[i]n addition to the immediate threat that she felt from Mr. Baylous she felt the threat, she felt the let down, she felt the abandonment of the personnel department, of the personnel office, Mr. Jonas." He opined that the experience of not being supported was an additional insult or second injury and that the confrontation with Baylous was another contributing factor. He acknowledged that plaintiff "is overly sensitive," but asserted she is "[n]ot a hypersensitive person."
Defendant, Baylous, testified that he never lifted plaintiff's sweater or told her to show her breasts to anyone either on that occasion or any other. He "admitted being a very touchy person" but only in a social and not in a sexual way.
Defendant, Toys `R' Us, presented evidence that Jonas, following the January 26, 1987 meeting with plaintiff, discussed plaintiff's concerns with Baylous' supervisor, Frankfort. Thereafter, Frankfort met with Baylous and advised him that an employee under his supervision had made allegations of sexual harassment; however, as requested, Frankfort did not identify plaintiff or reveal any of her specific allegations. Baylous told Frankfort that he had never been accused of sexual harassment, and no one had ever complained to him about his *628 conduct. Baylous denied any sexual intent. Frankfort advised him that the complaint involved touching and to be more cautious in his physical contact with the employees he supervised. Jonas also spoke with Baylous and directed him to be careful in the way he approached people. Jonas also refrained from identifying plaintiff or any of her specific complaints. Plaintiff was thereafter advised that Baylous had been spoken to.
Jonas also informed the Director of Employee Relations of plaintiff's accusations against Baylous. In light of plaintiff's assertion that window washers had been outside of Baylous' window during the alleged sweater-lifting incident, the director contacted the company's building maintenance personnel to determine whether work had been done in or about January, 1987. He was advised that the exterior windows of Toys `R' Us had not been washed during that time period. The director also contacted an outside company that performed window washing services for Toys `R' Us. He was advised that no work had been undertaken on the exterior windows at that time of year. The director relayed his findings to Wells. Wells testified at trial that no scaffolding of any kind had been used on the exterior of the facility in question during the winter of 1986-1987.
Jonas also testified that after he spoke with plaintiff in January, 1987, he monitored Baylous' interactions with co-workers by making unannounced visits to plaintiff's department. In addition, he met with plaintiff and a number of other parties during February and March, 1987. Plaintiff met with Jonas on March 9, 1987 and stated that nothing had happened to her since the last time they had met. On March 30, 1987, plaintiff met with Jonas and again advised that Baylous had not touched her or said anything offensive to her since their previous meeting. She added, however, that she had a feeling that something was going to happen. Jonas replied that he thought she was "being paranoid," but because of her concern, he offered a transfer to another department. Plaintiff suggested *629 the possibility of transferring to the Accounts Payable Department and working for her former supervisor; however, she subsequently rejected all transfer offers.
Jonas also contacted at least four of the women who plaintiff identified as being able to corroborate her allegations. These women, according to Jonas, could not confirm that Baylous had done anything that they found inappropriate or objectionable.
Toys `R' Us alleged that, following plaintiff's departure, it continued its investigation, but that after reviewing all of the information obtained it was concluded that Baylous had not subjected plaintiff or any other employee at Toys `R' Us to a sexually hostile work environment. Wells asserted he believed that Baylous had occasionally touched female co-workers in an asexual manner and had made a number of joking remarks, but he did not believe that Baylous had ever used the word "tits" in plaintiff's presence, or had lifted her sweater.
In May, 1987, plaintiff's counsel sent Toys `R' Us a letter requesting an opportunity to discuss the circumstances surrounding plaintiff's resignation. It replied to plaintiff's counsel letters by twice offering to reinstate plaintiff to her former position, or to reemploy her in a comparable position in another department, with no loss of salary or benefits. These offers apparently were not conditioned on plaintiff discontinuing her legal proceedings against defendants. The company's offers were rejected.
The trial judge, on September 6, 1990, issued a written opinion in which he acknowledged that "the validity of a plaintiff's claim of sexual discrimination requires an extremely fact sensitive analysis." He made what he described as "the following detailed factual statement":
Plaintiff, [T.L.], commenced employment at Toys "R" Us, as a file clerk, in August of 1981. From 1981 through April of 1987, when plaintiff resigned from Toys "R" Us, plaintiff held numerous positions and received several promotions. In November of 1985, Toys "R" Us hired defendant, Mr. Baylous, as the Director of Purchasing Administration. In his capacity as Purchasing Administration Director, defendant, Baylous directly supervised the work of *630 approximately 30 employees, including plaintiff. In September of 1986, defendant, Baylous promoted [T.L.] from Data Entry Supervisor to Systems Analyst.
On or about December 1986, plaintiff began feeling uncomfortable in the company of defendant, Baylous. Plaintiff alleges that while at a Christmas Party she saw Baylous touch a female employee, [D.A.], on the back. Also, plaintiff heard, during the same party, another female employee, [B.C.], tell Baylous to get his "F____ing" hands off of her. Plaintiff testified that these incidents made her "uncomfortable" in the presence of Baylous.
Plaintiff further testified that in January of 1987 she observed defendant, Baylous, grab the waist of a co-worker, [M.L.], and ask her if she went home for a "quickie" during her lunch break. Defendant, Baylous, did not recall the particular incident but explained that he had made comments to [M.L.] regarding going home for a "quickie" on various occasions. [M.L.] testified that she could not recall the particular incident plaintiff complained of but indicated that such an incident would not offend her. Another Toys "R" Us employee, [J.M.], corroborated plaintiff's testimony and explained that she had observed the "quickie" incident.
During January and February of 1987, the relationship between plaintiff and defendant, Baylous, continued to deteriorate. Plaintiff alleges that during a meeting in Baylous's office, in January of 1987, Baylous lifted the plaintiff's sweater above her bra strap in front of window washers who were on scaffolding outside of Baylous's office. Plaintiff testified that, as Baylous lifted her shirt, he said "give them (the window washers) a show". None of the individuals who testified at trial observed the incident. However, some co-workers recalled seeing plaintiff upset and crying after the incident occurred. Defendant, Baylous, denied the entire event. The defendant, Jeffrey Wells, Toys "R" Us' Vice President of Human Resources, and Richard Cudrin, the Director of Employee Relations at Toys "R" Us, testified that after investigating the situation they discovered that no window washers and no other scaffolding devices were employed by Toys "R" Us in January of 1987.
In addition to the previously mentioned incidents, plaintiff complains that defendant, Baylous, made various inappropriate comments to plaintiff and other female co-workers. On one occasion plaintiff alleges that Baylous told plaintiff she had a "cute little a____". Plaintiff further contends that she heard Baylous tell a co-worker that she had a cute "bump" or "rump". Also, plaintiff complains that Baylous told her to handle difficult male employees by "showing them her t____ts".
Plaintiff further testified that defendant, Baylous, offended her because he touched other female employees, as well as plaintiff, on the arms and the back. Also, plaintiff observed Baylous grab her sister's shoulders. (Plaintiff's sister was, at the time of the touching, a Toys "R" Us employee.)
Plaintiff testified that in January of 1987 she complained that she felt sexually harassed by defendant, Baylous. Plaintiff voiced her complaints to Eric Jonas, the Employee Relations Manager and on a separate occasion plaintiff spoke to William Frankfort, the Director of Merchandise Control and defendant Baylous' immediate supervisor. Plaintiff insisted that no one tell Baylous that she complained about his behavior. Mr. Jonas testified that he *631 investigated the allegations and found no violations of Toys "R" Us' sexual harassment policy. Nevertheless, Mr. Frankfort spoke to Baylous and told him to be very careful about the manner in which he approached employees. Additionally, Mr. Jonas' testimony indicates that, in March of 1987, Mr. Jonas offered plaintiff a transfer from her department to a comparable position in another department with no change in salary or benefits. Plaintiff declined the offer.
On or about April 6, 1987 plaintiff informed Howard Moore, Executive Vice President, that she intended to resign and give the company two weeks notice. Mr. Moore contacted defendant Wells, who in turn, contacted Ms. Lambert, the Manager of Recruitment and Placement. Ms. Lambert interviewed the plaintiff to further ascertain exactly what plaintiff's complaints were. Ms. Lambert offered plaintiff, for the second time, a transfer from her department to a comparable position in another department with no loss of salary or benefits. Again, plaintiff rejected the offer.
On April 7, 1987, pursuant to Mr. Well's direction, Ms. Lambert arranged a meeting between defendant, Baylous, plaintiff and Ms. Lambert. During the meeting plaintiff confronted defendant, Baylous, for the first time, with the allegations that Baylous sexually harassed plaintiff. Baylous denied the allegations, apologized to plaintiff for any misunderstanding and attempted to convince plaintiff not to resign. After the meeting, plaintiff left Toys "R" Us and called Ms. Lambert on April 10, 1987 to advise that she would not return to Toys "R" Us to complete her last two weeks.
Following his "factual statement," the Law Division judge discussed the law which he felt was applicable to claims of sexual harassment. He thereafter concluded, in pertinent part, as follows:
In the case at bar, plaintiff has not proffered enough evidence to show that defendant, Baylous, acted intentionally to harass plaintiff because she was a woman. Additionally, plaintiff has not proven that the discrimination was pervasive and regular. The complained of conduct creates a hostile work environment when it is repeated to the point where it is routine and becomes a condition of employment. [Citation omitted].
Assuming that all incidents plaintiff and plaintiff's witnesses testified to occurred, Baylous' actions, although annoying, were not sufficiently outrageous to sustain plaintiff's allegations. A review of the record indicates that Baylous touched plaintiff and other employees in an asexual manner on a number of occasions. This type of touching does not amount to sexual harassment or discrimination. Baylous made several rude and off color comments to plaintiff and other employees. Off color remarks are insufficient to create a sexually hostile work environment. [Citation omitted]. Also, the evidence does not indicate that Baylous' vulgarity affected the totality of the work environment. On the contrary, several witnesses testified that Baylous' actions did not offend them. Baylous' behavior with regard to the sweater-lifting incident was improper and child-like. However, the sweater-lifting incident combined with *632 rude comments and occasional asexual touchings does not amount to a sexually hostile environment.
An important factor in this Court's determination is the amount of time over which the alleged acts of harassment occurred.... Thus, this Court finds that the conduct plaintiff complained of did not occur regularly over a sufficiently lengthy period of time to become a "condition" of plaintiff's employment.
The judge further found that, although Baylous' conduct adversely affected plaintiff, it would not have affected a reasonable person of the same sex in plaintiff's position. He concluded that Baylous' conduct did not create an impermissible hostile working environment, and, therefore, there was no sexual discrimination in violation of the LAD.
Having determined that Baylous' conduct did not constitute sexual harassment, the judge concluded that Toys `R' Us could not be in violation of the LAD either on a respondeat superior theory or because of improper investigation of the charges. He observed, nonetheless, that "[i]t appears from the testimony, that Toys "R" Us employees, in charge of investigating the matter, did not properly and thoroughly attend to plaintiff's allegations, thus exacerbating plaintiff's problems."
The judge dismissed all claims against defendant, Wells, because the proofs did not satisfy the requirements "for giving unreasonable publicity to one's private life" citing Bisbee v. John C. Conover Agency, Inc., 186 N.J. Super. 335, 339, 452 A.2d 689 (App.Div. 1982). He also found a lack of intent on Wells' part to subject plaintiff to outrageous conduct or harm. The court rejected plaintiff's allegations of tortious interference with contractual relations as to all defendants.
We conclude that a remand for further fact finding is unavoidable. The trial judge, although acknowledging that plaintiff's claim was extremely fact sensitive, failed to make sufficient factual findings to permit final disposition. The judge did not make an unequivocal determination as to whether Baylous, who specifically denied the sweater-lifting incident and denied making the sexually-oriented comments to plaintiff, did do those things. Rather, the judge rendered his opinion based *633 on a hypothesis that "assum[ed] that all incidents plaintiff and plaintiff's witnesses testified to occurred...." We believe that the judge should have made specific factual findings and supported those findings with reasons and explanations.
We now turn to our analysis of the applicable law to be applied to the facts as the judge may find them to be on remand. Plaintiff did not claim that there was "quid pro quo" sexual harassment carried out against her. See Erickson v. Marsh & McLennan Co., 117 N.J. 539, 555-56, 569 A.2d 793 (1990). There was no claim that Baylous sought sexual favors in the workplace as a price for proper treatment of plaintiff. Plaintiff readily admitted that, to her knowledge, Baylous never sought sexual favors from any of his subordinates.
Rather, plaintiff complained that sexually-related offensive conduct resulted in the creation of a hostile work environment. Id. The following two provisions of the LAD provide the underlying statutory framework for plaintiff's claims.

N.J.S.A. 10:5-4. Obtaining employment, accommodations and privileges without discrimination; civil right
All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

N.J.S.A. 10:5-12. Unlawful employment practice or unlawful discrimination
It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status or sex of any individual ... to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment....
We have looked to federal cases dealing with Title VII for assistance in interpreting the New Jersey Act, as our Supreme Court stated in Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990) was appropriate. Id. (adopting "the Supreme Court's analysis of unlawful discrimination *634 claims brought under Title VII of the Civil Rights Act of 1964"); see Erickson, 117 N.J. at 551, 569 A.2d 793 (using Title VII analysis in a case involving a LAD claim charging gender discrimination due to a failure to promote); Goodman v. London Metals Exch., 86 N.J. 19, 429 A.2d 341 (1981) (applying Title VII analysis to a LAD claim in which sex discrimination was alleged when employer refused to hire plaintiff).
Although no New Jersey case has specifically addressed the issue of sex discrimination as it pertains to non quid pro quo sexual harassment, we are convinced that when a supervisor makes unwelcome offensive remarks or physical contact with a subordinate employee that would not otherwise have been made, but for the sex of the subordinate, such conduct discriminates on the basis of sex. In Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), it was held "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Id. at 66, 106 S.Ct. at 2405, 91 L.Ed.2d at 59; see Erickson, 117 N.J. at 555-56, 569 A.2d 793.
Sexual harassment has been held to result in a hostile work environment when the offensive conduct was either "severe or pervasive," or "pervasive and regular." Ellison v. Brady, 924 F.2d 872, 876, 878 (9th Cir.1991); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990). We would not necessarily preclude a claim of hostile work environment when a plaintiff proves only a single yet severe act of sexual discrimination. As noted by the Ninth Circuit in Ellison:
[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct. See King v. Board of Regents of University of Wisconsin System, 898 F.2d 533, 537 (7th Cir.1990) ("[a]lthough a single act can be enough, ... generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident.") Accord Andrews, 895 F.2d at 1484; Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir.1989); EEOC Compliance Manual, § 615, ¶ 3112, C at 3243 (CCH 1988). For example, in Vance v. Southern *635 Bell Telephone and Telegraph Co., 863 F.2d 1503, 1510 (11th Cir.1989), the court held that two incidents in which a noose was found hung over an employee's work station were sufficiently severe to constitute a jury question on a racially hostile environment. [924 F.2d at 878].
In all cases, the evidence must demonstrate that the alleged perpetrator's conduct was "unwelcome." Meritor, 477 U.S. at 65, 106 S.Ct. at 2404, 91 L.Ed.2d at 58. See Ellison v. Brady, 924 F.2d at 875-76. Although we consider this to be an implicit requirement for conduct to constitute sexual harassment, we do not regard acquiescence or even consent of the victim to negate this element as a matter of law. The issue is one of fact, dependent on the surrounding circumstances. Meritor, 477 U.S. at 68-69, 106 S.Ct. at 2406-07, 91 L.Ed.2d at 60-61.
Here, in evaluating plaintiff's claim, the trial judge applied the following five-part test set forth in Andrews:
(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. [895 F.2d at 1482; (footnote omitted)].
Initially, we note that we do not agree with the trial judge's application of the first prong of the Andrews test which provides: "[T]he employees suffered intentional discrimination because of their sex." Id. The trial judge interpreted that prong to require that Baylous must have been shown to have "acted intentionally to harass plaintiff because she was a woman." (Emphasis added).
We are satisfied that, so long as plaintiff can demonstrate that defendant's offensive conduct was unwelcome, intentional, and sexually oriented to the extent that it would not have occurred but for the fact that plaintiff was a woman, it need not be shown that defendant intended to harass plaintiff. It may be that Baylous did not recognize that his conduct constituted sexual harassment or misconduct. We have no doubt that many actions that a reasonable woman would "find offensive are perceived by men to be harmless and innocent." *636 See Sexual Harassment Claims of Abusive Work Environment Under Title VII, 97 Harv.L.Rev. 1449, 1451 (1984).

See, e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, 898 (1st Cir.1988) ("A male supervisor might believe, for example, that it is legitimate for him to tell a female subordinate that she has a `great figure' or `nice legs.' The female subordinate, however, may find such comments offensive"); Yates [v. Avco Corp.], 819 F.2d [630] at 637, n. 2 [1987] ("men and women are vulnerable in different ways and offended by different behavior"). See also Enrenreich, Pluralist Myths and Powerless Men: The Ideology of Reasonableness in Sexual Harassment Law, 99 Yale L.J. 1177, 1207-1208 (1990) (men tend to view some forms of sexual harassment as "harmless social interactions to which only overly-sensitive women would object"); Abrams, Gender Discrimination and the Transformation of Workplace Norms, 42 Vand.L.Rev. 1183, 1203 (1989) (the characteristically male view depicts sexual harassment as comparatively harmless amusement). [Ellison v. Brady, 924 F.2d 872, 878-79 (9th Cir. 1991)].
Baylous' alleged remarks telling plaintiff to use and show off various parts of her female anatomy and his act of raising her sweater during one such encounter clearly would be in the nature of conduct carried out only because of plaintiff's sex.
Further, the trial judge's conclusion that plaintiff had not proven that the discrimination was "pervasive and regular" as required by the second prong of the Andrews test appears to be contrary to the record. See Rova Farms Resort v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). The opinion of the trial judge notwithstanding, Baylous' actions and comments towards the plaintiff, if found to have occurred, would not merely be annoying, but would appear to constitute sufficiently sexually outrageous and continuous conduct, covering a period of at least several weeks, to be classified as "pervasive and regular." Andrews, 895 F.2d at 1482.
The United States Supreme Court in Meritor said that it is the conditions of the victim's employment that are to be considered in determining whether the conduct is sufficiently "severe and pervasive" to create an abusive working environment. 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60. The following factors should be considered in making this determination:

*637 (1) whether the conduct was verbal or physical, or both; (2) how frequently it was repeated; (3) whether the conduct was hostile and patently offensive; (4) whether the alleged harasser was a co-worker or a supervisor; (5) whether others joined in perpetrating the harassment; and (6) whether the harassment was directed at more than one individual. [EEOC Compliance Manual (CCH) § 615, ¶ 3114, C at 3274 (1990)].
In Ellison, the court examined the issue of what constitutes the similar criteria of "severe and pervasive conduct" and stated:
It is the harasser's conduct which must be pervasive or severe, not the alteration in the conditions of employment. Surely, employees need not endure sexual harassment until their psychological well-being is seriously affected to the extent that they suffer anxiety and debilitation. Accord, EEOC Policy Guidance on Sexual Harassment, 8 Fair Employment Practices Manual (BNA) 405:6681, 6690, n. 20 (March 19, 1990). Although an isolated epithet by itself fails to support a cause of action for a hostile environment, Title VII's protection of employees from sex discrimination comes into play long before the point where victims of sexual harassment require psychiatric assistance.
....
Next, we believe that in evaluating the severity and pervasiveness of sexual harassment, we should focus on the perspective of the victim. King, 898 F.2d at 537; EEOC Compliance Manual (CCH) § 615, ¶ 3112, C at 3242 (1988) (courts "should consider the victim's perspective and not stereotyped notions of acceptable behavior.") If we only examined whether a reasonable person would engage in allegedly harassing conduct, we would run the risk of reinforcing the prevailing level of discrimination. Harassers could continue to harass merely because a particular discriminatory practice was common, and victims of harassment would have no remedy. [Ellison, 924 F.2d at 878].
Viewed from plaintiff's perspective, Baylous' words and actions, if fully accepted by the trial judge as asserted by plaintiff, would appear to rise to the level of "regular and pervasive."
The trial judge further concluded that Baylous' acts, other than the sweater incident, could not reasonably be classified as being anything more than social touchings or contact that did not rise to the level of sexual harassment. We believe that the trial judge may have erroneously arrived at this conclusion by focusing separately on those additional touchings that occurred to plaintiff and other female employees that plaintiff testified to as causing her further concern. Those so-called *638 social touchings or contact that the psychologist testified served to cause further anxiety to the plaintiff should not have been unduly focused on or used to detract from the serious nature of the sexually-oriented remarks and touchings that plaintiff asserted were perpetrated against her personally. Contrary to the trial judge's assertion, we find no requirement under either Andrews or Ellison that "the evidence ... indicate that Baylous' vulgarity affected the totality of the work environment." 924 F.2d at 878. ("It is the harasser's conduct which must be pervasive or severe, not the alteration in the conditions of employment.")
After applying the third prong of the Andrews test, the trial judge found plaintiff to have been detrimentally affected by defendant's conduct. Nonetheless, when applying the fourth prong, he concluded that "the evidence does not reveal that a reasonable person of the same sex in plaintiff's position would also have been adversely affected." See Andrews, 895 F.2d at 1482. Again, the trial judge unduly focused on the testimony concerning Baylous' conduct towards others and not the conduct directly affecting plaintiff. He based his evaluation on the testimony of "several witnesses who testified during trial ... that although Baylous' conduct was annoying, it did not offend or bother" them. On several occasions Baylous allegedly made remarks to plaintiff about using her breasts, on another occasion lifted her sweater and told her to let others see her breasts, and referred to her as having a "cute little ass." Clearly, if the conduct that plaintiff claims Baylous directly engaged in towards her actually occurred, it would also have detrimentally affected a reasonable woman in that position. See Ellison, 924 F.2d at 879.
We now consider the vicarious liability of plaintiff's employer if Baylous' conduct is found to have constituted sexual harassment. The trial judge, having determined that Baylous' conduct did not amount to sexual harassment, concluded that Toys `R' Us could not have violated the LAD on a respondeat superior theory. Although it is true that the fifth prong of the *639 Andrews test requires "the existence of respondeat superior liability," we believe it is unwise to premise employer liability under our LAD on the doctrine of respondeat superior when a supervisor sexually harasses a subordinate employee in the workplace.
To condition liability on a finding of respondeat superior would in many, if not most cases, preclude liability of the employer because the intentional acts of sexual harassment by the supervisory employee would likely be considered to be outside the scope of employment. See Restatement (Second) of Agency § 219(1) (1958). This is particularly true when, as here, the employer has adopted a comprehensive written policy prohibiting unwelcomed sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature such as uninvited touchings or sexually-related comments.
As is demonstrated in the present case, the subordinate employee may be severely inhibited from reporting a supervisor's improper conduct because of fear of reprisal. One must recognize that it is the supervisor to whom an employee should be able to turn for protection against offensive conduct in the workplace. Viewing the workplace from the position of the employee, the supervisor is generally considered "the boss." The supervisor is placed in that position by the principal. We do not think it is overly burdensome to hold the employer liable for the transgressions of a supervisor where the purpose of the imposition of the burden is to protect the worker from prohibited sexual discrimination.
The Legislature's intention in enacting the LAD was to permit actions for compensatory and punitive damages to be used as a weapon to rid the workplace of sexual harassment. See N.J.S.A. 10:5-3. Our Legislature, after enumerating the harms caused by discrimination, specifically declared:
Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be *640 liberally construed in combination with other protections available under the laws of this State. [Id. (emphasis supplied)]
The goal of the Legislature is furthered by the imposition of liability on an employer for those acts of sexual harassment by its supervisory employees on subordinate employees.
As a practical matter, in many instances the supervisor would not be in a financial position to satisfy even a compensatory judgment where the damages are substantial. It is likely that the supervisor's employment may be terminated when sexual harassment has been proved. The employer may be the only financially responsible or insurable party in these circumstances. If the employer is not held liable, a severely damaged subordinate employee could go uncompensated, contrary to the intent of the LAD.
The analysis undertaken in Ellison, 924 F.2d at 881-83, concerning "what remedial actions taken by employers can shield them from liability" for sexual harassment by co-workers is inapplicable to sexual harassment by a supervisor of a subordinate employee. Id. at 881. Cf. Meritor, 477 U.S. at 72, 106 S.Ct. at 2408, 91 L.Ed.2d at 63 (employers are not strictly liable for sexual harassment by supervisors under Title VII, reversing imposition of absolute liability by court of appeals in Vinson v. Taylor, 753 F.2d 141, reh'g denied en banc, 760 F.2d 1330 (D.C. Cir.1985)).
By imposing liability on the employer for sexual harassment by its supervisory employees there is greater incentive for the employer to not only educate all employees regarding the prevention of sexually-oriented conduct, but also strong reason to use all available resources to rid the workplace of such conduct. See id. Merely creating an affirmative duty on the employer to investigate and act against sexual harassment, see Ellison, 924 F.2d at 882; Harris v. International Paper Co., 765 F. Supp. 1509, 1516 (D.Me.), vacated in part, 765 F. Supp. 1529 (1991), provides insufficient protection against sexual harassment by supervisory employees. Further, the facts of this case tend to demonstrate that management may be less *641 than capable of recognizing and remedying improper sexual conduct among its own.
We therefore hold that liability for compensatory damages, not punitive damages, under LAD will flow to the employer when the sexual harassment is carried out in the workplace by a supervisory employee on a subordinate to the extent required to constitute sexual discrimination. Thus, to recover compensatory damages for actual loss or damage from sexual harassment,[1] there need not be a showing that the employer failed to conduct a sufficient investigation of the subordinate's complaints of sexual harassment by a supervisor or that the employer failed to act properly to prevent the harm or condition in the workplace. Cf. Meritor, 477 U.S. at 72-73, 106 S.Ct. at 2408-09, 91 L.Ed.2d at 62-63; Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 576-77 (10th Cir.1990). We, however, do not mean to suggest that a plaintiff would be precluded from introducing evidence of the employer's independent misconduct as a basis for establishing entitlement to additional damages.
Although the trial judge awarded plaintiff $5,000 compensatory damages against Baylous for a battery, the judge withheld an award of punitive damages "because there is no evidence that Baylous acted with malice towards plaintiff." It is well-settled that punitive damages may be awarded in a battery action. See Tiberi v. Petrella, 60 N.J. Super. 513, 518, 159 A.2d *642 439 (App.Div. 1960). In the usual setting malice may be presumed from the type of battery inflicted. Id. Here, however, the battery was of such a nature that there may not have been an intent to harm. Baylous' remarks and acts may even have been done in jest. This, however, does not compel the conclusion that the court cannot find malice. Baylous' alleged sexually-oriented act of raising his female subordinate's sweater and telling her to give the others a show would be an obvious violation of her right to remain free from such a touching, and was in wanton disregard of her privacy and feelings. Id.
We expect on remand that the trial judge will make specific findings on the nature and extent of Baylous' words and acts surrounding the alleged sweater incident. If the circumstances as alleged by plaintiff surrounding the sweater incident are found to be true, Baylous' act should be considered an outrageous violation of the personal rights of a female subordinate. Despite the absence of the threat of physical safety to the victim found in the usual battery, the wanton disregard of plaintiff's personal rights and sensitivities alleged would, if believed, be sufficient to permit the award of exemplary damages. See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49-51, 477 A.2d 1224 (1984) (extended discussion regarding award of punitive damages).
The observation of Judge Skillman, in his separate opinion, that the majority's utilization of the Andrews test-framework results in a more rigid approach to the determination of when a hostile work environment and resultant sexual discrimination claim exists is well-taken. He also correctly observes that we have expended considerable effort to explain and reinterpret the various prongs of the Andrews test. This, however, is the manner in which new fields of law invariably are developed. See Muench v. Township of Haddon, 255 N.J. Super. 288, 298-299, 605 A.2d 242, 247-248 (App.Div. 1992). It is the considered judgment of the majority that a more structured test is required at this juncture. Id.
*643 Conversely, we deem it necessary to maintain a flexible position with regard to the awarding of compensatory damages. Each case must be considered on its own facts. We, the majority, are confident that existing principles of proximate cause and remedies are sufficient to properly balance the claimants' need to be compensated for the many forms of injury and damage that may result from sexual harassment and the imposition of appropriate remedies, including damages, against the responsible party.
We affirm the trial judge's dismissal of plaintiff's claims against defendants, Jeffrey Wells and Toys `R' Us, as alleged in the fifth count of plaintiff's second amended complaint wherein she alleged that they invaded her privacy and acted unreasonably by arranging a meeting between Baylous and the plaintiff. We also affirm the judge's dismissal of plaintiff's claims of tortious interference with contractual relations and for intentional infliction of emotional distress. We affirm on those issues substantially for the reasons expressed by the trial judge in his written decision of September 6, 1990.
We remand to the Law Division for precise findings as to each alleged incident. The trial judge should then evaluate the totality of the evidence and determine whether a sexually-hostile work environment existed based on application of the standards we have outlined in this opinion.
We reverse the trial judge's dismissal of plaintiff's action under the LAD against Toys `R' Us and Baylous. We remand for further fact finding and, if appropriate, the assessment of additional compensatory and punitive damages against Baylous and the award of only compensatory damages against Toys `R' Us in conformance with this opinion.
D'ANNUNZIO, J.A.D., concurring.
Discrimination against women effected through the creation of a sexually offensive environment is a newly emerging area of the law, Andrews v. City of Philadelphia, 895 F.2d 1469, *644 1482 (3d Cir.1990), and we should approach the development of that law carefully and advisedly. I agree with Judge Skillman that the issue of employer liability in this field based on the creation of a sexually offensive environment by a middle management employee is a complex subject.
I am inclined to the view that strict liability for damages is inappropriate in this type of case. I would posit employer liability on traditional principles of respondeat superior and, alternatively, on an employer's inadequate response when it knows or has reason to know that one or more of its employees has created a sexually offensive environment. See Meritor Savings Bank v. Vinson, 477 U.S. 57, 72, 106 S.Ct. at 2408, 91 L.Ed.2d 49, 62-63 (1986); Andrews, supra, 895 F.2d at 1486; Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316-1317 (11th Cir.1989).
The overriding purpose of the LAD is to eliminate discrimination. Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 96, 570 A.2d 903 (1990). An employer's exposure to damages is designed, in part, to compel adherence to this goal. An employer can attempt to prevent sexual harassment through the adoption of policy statements, the establishment of procedures for dealing with alleged acts of harassment and through training and consciousness raising events. However, an employer cannot stop acts of harassment unless it knows about them. The elimination of discrimination is advanced, therefore, if the law requires the victim to bring acts of harassment to the attention of the harasser's supervisor.[1] Once an employer is thus placed on notice its liability may be based on its failure to act or otherwise adequately address the problem.
Strict liability would be counterproductive to the goal of eliminating this form of discrimination. Under a strict liability *645 regime, a well-counseled victim would refrain from notifying her harasser's superior out of concern that notice might result in swift remedial action by the employer, thereby mitigating the victim's damages or preventing accrual of a cause of action.
I concur in the remand for fact finding and I am in general agreement with Judge Shebell's definition of the cause of action. In my view, it is unnecessary in this case to attempt to chisel in stone the elements of the cause of action. If Baylous did what plaintiff alleges he did, even without the sweater incident, he created a sexually offensive environment and, therefore, violated the LAD, whether we apply the analysis of Judge Shebell or Judge Skillman.
SKILLMAN, J.A.D., concurring in part, dissenting in part.
I agree with the majority's basic holding that an employer who subjects an employee to a hostile work environment on the basis of sex violates the Law Against Discrimination (LAD). I also agree with the majority's conclusion that the trial court's order dismissing plaintiff's claims under the LAD must be reversed and the matter remanded. However, I dissent from the majority's directions to the trial court regarding the criteria it should apply in reconsidering plaintiff's hostile work environment sex discrimination claim.
The LAD provides in relevant part that it is an unlawful employment practice "[f]or an employer, because of the ... sex... of any individual, ... to discriminate against such individual ... in terms, conditions or privileges of employment." N.J.S.A. 10:5-12(a). In Erickson v. Marsh & McLennan Co., 117 N.J. 539, 555-57, 569 A.2d 793 (1990), the Court suggested, without expressly deciding, that conduct which creates a hostile working environment on the basis of sex violates this provision. And in Drinkwater v. Union Carbide Corp., 904 F.2d 853, 861 (3d Cir.1990), the court "predicted," based on its reading of Erickson, that the Supreme Court of New Jersey would hold that sexual harassment in the form of a hostile work environment *646 violates the LAD. Recently, another panel of this court expressly held that an employer who is responsible for subjecting an employee to a hostile work environment because of the employee's sex violates the LAD. Muench v. Township of Haddon, 255 N.J. Super. 288, 295-298, 605 A.2d 242, 246-247 (App.Div. 1992). I join the majority in following our colleagues' holding in Muench.
My disagreement with the majority relates to the proof which an employee must present and the findings which the trier of fact must make to establish a hostile work environment sex discrimination claim. In concluding that plaintiff's proofs, even if found fully credible, would not establish a violation of the LAD, the trial court applied the five tests set forth in Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990):
We hold that five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII: (1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. [Id. at 1482].
As I read the majority's opinion, it accepts the first four Andrews tests for judging a hostile work environment sex discrimination claim. To be sure, the majority's discussion of the Andrews requirement that sexual harassment must be "pervasive and regular" is somewhat ambivalent. At one point, the majority states, somewhat cryptically, that "[w]e would not necessarily preclude a claim of hostile work environment when a plaintiff proves only a single yet severe act of sexual discrimination." (op. at 634, 605 A.2d at 1135). However, the majority later spends two-and-a-half pages discussing the "pervasive and regular" test (op. at 636-638, 605 A.2d at 1136-1137). Consequently, the majority's opinion undoubtedly will be read to hold that the first four Andrews tests must be used to determine whether a hostile work environment sex discrimination claim has been established.
*647 I believe that the first four Andrews tests impose an unduly heavy burden upon a party seeking to establish a hostile work environment sex discrimination claim. Therefore, I would not adopt those tests for use in connection with claims brought under the LAD. I also disagree with the majority opinion insofar as it holds that an employer is automatically liable for every form of compensatory damages imposed on the basis of a supervisory employee's sexually harassing conduct.
Preliminarily, I note that the Third Circuit is the only federal circuit which follows the Andrews tests in considering hostile work environment sex discrimination claims brought under Title VII. Other circuits have adopted different approaches. See, e.g., Daniels v. Essex Group, Inc., 937 F.2d 1264, 1271-72 (7th Cir.1991) (holding that in evaluating a Title VII harassment claim, the court must consider "the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her well-being, as well as the actual effect upon the particular plaintiff bringing the claim."); Ellison v. Brady, 924 F.2d 872, 879 (9th Cir.1991) (holding that "a female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."); Bell v. Crackin Good Bakers, Inc., 777 F.2d 1497, 1053 (11th Cir.1985) (holding that to establish a claim under Title VII plaintiff must show harassment "affected a term, condition, or privilege of employment" and that "the employer knew or should have known of the harassment in question and failed to take prompt remedial action."). Indeed, one circuit has expressly criticized the Andrews tests. In Daniels v. Essex Group, Inc., supra, 937 F.2d at 1271, the Seventh Circuit observed that a "multi-factor" test, such as the one adopted in Andrews, "has the potential for mechanical application that overlooks or underemphasizes the most important features of the harassment inquiry."
*648 In my view, the deficiencies in the Andrews tests are well illustrated by the trial court's application of those tests in this case and by the majority's efforts to explain and reinterpret those tests. Thus, while the majority adopts the requirement of the first Andrews test that sexual harassment must be shown to be "intentional" to violate the LAD, it also states that "so long as plaintiff can demonstrate that defendant's offensive conduct was unwelcome, intentional, and sexually oriented to the extent that it would not have occurred but for the fact that plaintiff was a woman, it need not be shown that defendant intended to harass plaintiff" (op. at 635, 605 A.2d at 1135). Likewise, the majority's discussion of the Andrews requirement that hostile work environment sexual harassment must be "pervasive and regular" is so ambivalent that it will not provide trial courts with any meaningful guidance.
Instead of the Andrews tests, I would adopt the approach reflected in the Guidelines on Discrimination Because of Sex, adopted by the Equal Employment Opportunity Commission (EEOC). 29 C.F.R. § 1604.1 to § 1604.11. Those guidelines state in pertinent part:
Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. [29 C.F.R. § 1604.11(a)(3)].
The EEOC guidelines also state that:
In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances.... The determination of the legality of a particular action will be made from the facts, on a case by case basis. [29 C.F.R. § 1604.11(b)].
These guidelines, unlike the Andrews tests, are sufficiently flexible to recognize the wide variety of forms which hostile work environment sexual discrimination may take and to allow for the evolution of this new area of the law.
In addition, the New Jersey Division on Civil Rights has issued a brochure, entitled Employment Guide to the New Jersey Law Against Discrimination, which defines hostile *649 work environment sexual harassment in precisely the same language as section 1604.11(a)(3) of the EEOC guidelines. Although this brochure has not been formally adopted as an administrative regulation, it appears to reflect the Division on Civil Rights' view of the elements of hostile work environment sex discrimination.
The EEOC guidelines also seem to have been implicitly endorsed by the Supreme Court of the United States in Meritor, 477 U.S. at 65-67, 106 S.Ct. at 2404-06, 91 L.Ed.2d at 58-60. Therefore, the use of these guidelines will promote consistent interpretation of the LAD and Title VII as applied to claims of hostile work environment sex discrimination.
It is necessary to add one caveat regarding the EEOC guidelines. Section 1604.11(a)(3) may be read to limit hostile work environment sex discrimination to sexual advances or other conduct of a sexual nature. However, I agree with the view expressed by another panel of this court in Muench v. Township of Haddon, supra, 255 N.J. Super. at 296-297, 605 A.2d at 246-247 and in McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir.1985) that such discrimination may occur without "sexual advances" or other conduct with "clearly sexual overtones." "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir.1988). Therefore, "any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may ... comprise an illegal condition of employment under Title VII." Muench v. Township of Haddon, 255 N.J. Super. at 297, 605 A.2d at 247 (quoting McKinney v. Dole, supra, 765 F.2d at 1138); accord Andrews v. City of Philadelphia, supra, 895 F.2d at 1485; Hall v. Gus Constr. Co., supra, 842 F.2d at 1013-14; Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir.1987); Bell v. Crackin Good Bakers, Inc., supra, 777 F.2d at 1503.
*650 The following sections of this opinion examine each of the Andrews tests to show the problems which may arise in their application and how those problems can be avoided by the approach taken in the EEOC guidelines.

I
The requirement of the first Andrews test that discrimination in the form of a sexually hostile working environment must be "intentional" is inconsistent with a long line of cases interpreting Title VII of the Federal Civil Rights Act of 1964 and the LAD. In Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971), the Supreme Court observed that "Congress directed the thrust of [Title VII] to the consequences of employment practices, not simply the motivation." Similarly, in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396, 423 (1977), the Court stated that "a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group."
This does not mean that discriminatory intent is irrelevant in Title VII litigation. Rather, the Supreme Court's decisions distinguish between employment discrimination claims based upon "disparate treatment," in which a showing of discriminatory intent is required, and claims based upon "discriminatory impact," which require no showing of discriminatory intent. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986-87, 108 S.Ct. 2777, 2784-85, 101 L.Ed.2d 827, 840 (1988); International Brotherhood of Teamsters v. United States, supra, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, 52 L.Ed.2d at 415; see also Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 798 (3d Cir.1991).
Our courts also have adopted this distinction in interpreting the LAD. See Countiss v. Trenton State College, 77 N.J. 590, 595, 392 A.2d 1205 (1978); Peper v. Princeton University Bd. *651 of Trustees, 77 N.J. 55, 81-82, 389 A.2d 465 (1978); Giammario v. Trenton Bd. of Educ., 203 N.J. Super. 356, 361-62, 497 A.2d 199 (App.Div.), certif. denied, 102 N.J. 336, 508 A.2d 212 (1985), cert. denied, 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986). Thus, while decisions involving claims of discriminatory treatment have referred to discriminatory intent as a "crucial element" of the plaintiff's case, Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 30, 429 A.2d 341 (1981), claims of discriminatory impact have been sustained without any showing of discriminatory intent on the part of the employer. See Countiss v. Trenton State College, supra, 77 N.J. at 595, 392 A.2d 1205 ("[T]he `impact' of the disparate treatment is such as to categorize the resulting discrimination as based on sex regardless of the absence of invidious intent."); see also Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 378, 541 A.2d 682 (1988) ("Unconscious discrimination prejudices its victims as effectively as discrimination that is malicious.").
In Ellison v. Brady, supra, 924 F.2d 872, the court applied these principles and concluded that a hostile work environment sex discrimination claim may be established without a showing of discriminatory intent:
[T]he reasonable victim standard we adopt today classifies conduct as unlawful sexual harassment even when harassers do not realize that their conduct creates a hostile working environment. Well-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action if a reasonable victim of the same sex as the plaintiff would consider the comments sufficiently severe or pervasive to alter a condition of employment and create an abusive working environment. That is because Title VII is not a fault-based tort scheme. "Title VII is aimed at the consequences or effects of an employment practice and not at the ... motivation" of co-workers or employers. Rogers [v. E.E.O.C.], 454 F.2d [234] at 239 [(5th Cir.1971)]; see also Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (the absence of discriminatory intent does not redeem an otherwise unlawful employment practice). [924 F.2d at 880].
See also Bundy v. Jackson, 641 F.2d 934, 945 (D.C. Cir.1981) ("Sexual stereotyping through discriminatory dress requirements may be benign in intent, and may offend women only in a general, atmospheric manner, yet it violates Title VII."); Note, Sexual Harassment Claims of Abusive Work Environment *652 Under Title VII, 97 Harv.L.Rev. 1449, 1456 (1984) ("There is no point in litigating the motive behind sexual harassment; by definition, sexual harassment occurs because of the harassed employee's sex.").
The EEOC regulations also recognize that a showing of discriminatory intent is not a prerequisite for establishing the existence of hostile working environment sex discrimination. Those regulations indicate sexual harassment consists of conduct which has either the "purpose" or the "effect" of "unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Similarly, I would construe the LAD to allow a finding of hostile work environment sex discrimination based on the "effect" of conduct in the workplace, without a showing of any discriminatory intent.

II
I turn next to the Andrews requirement that sexual harassment be shown to be "pervasive and regular" in order to establish a hostile work environment claim. Certainly, the LAD's prohibition against discrimination on the basis of sex in "terms, conditions and privileges" of employment does not extend to every sexually suggestive comment made in the workplace. As stated by the Supreme Court of the United States in interpreting the same language in Title VII:
[N]ot all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. See Rogers v. EEOC, supra, at 238 ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to sufficiently significant degree to violate Title VII); Henson [v. City of Dundee], 682 F.2d [897], at 904 [(11th Cir.1982)] (quoting same). For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." Ibid. [Meritor Savings Bank v. Vinson, supra, 477 U.S. at 67, 106 S.Ct. at 2406, 91 L.Ed.2d at 60].
See also Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1236 (D.C. Cir.1984) ("A single, isolated racial joke, unattended by any indicia of discriminatory animus, may not be sufficient in *653 itself to establish a violation."); 1 Arthur Larson & Lex K. Larson, Employment Discrimination, § 41.64(d)(ii) at 8-184 ("[A] few isolated leers or rude comments will generally not constitute actionable harassment.").
However, the requirement of Andrews that sexually hostile work environment discrimination must be "pervasive and regular" imposes a more onerous burden than the requirement of Meritor that sexual harassment be shown to be "sufficiently severe or pervasive `to alter the conditions of [the victim's] employment and create an abusive working environment.'" (Emphasis added). The Meritor formulation recognizes that if sexual harassment is sufficiently "severe" it need not be "pervasive" whereas the second Andrews test requires such discriminatory conduct to be both "pervasive" and "regular." Thus, Andrews would seem to preclude a finding of hostile work environment sexual harassment based on a single incident, regardless of its severity or its impact upon the victim. Indeed, the "pervasive and regular" test would seem to preclude a finding of sexual harassment based on multiple incidents unless they occurred with regularity over some period of time. For example, a plant foreman might declare a "ladies day" during which all female employees were subject to a variety of sexual abuse, but the employer would not be found to have violated Title VII because the harassment was not "regular."
An additional problem with the Andrews requirement that hostile work environment discrimination be "pervasive and regular" is that it is superimposed upon the other Andrews tests, including test four, which requires a complaining party to show that "the discrimination would detrimentally affect a reasonable person of the same sex in that position." Thus, under Andrews the "pervasiveness" and "regularity" of sexual harassment are not used simply as indicators of whether workplace conduct would detrimentally affect a reasonable person of the same sex in that position. Instead, the "pervasive and regular" test could defeat the claim of a complainant who was *654 able to show through other indicators, such as the severity of the harassment and the closeness of a working relationship, that workplace conduct would detrimentally affect a reasonable person of the same sex in the position. In my view, this result would be inconsistent with the broad remedial objectives of the LAD.
Other courts have taken a different approach and recognized that a hostile work environment discrimination claim may be established on the basis of a single incident. Thus, in Radtke v. Everett, 189 Mich. App. 346, 471 N.W.2d 660 (1991), the court held that a veterinarian who made a physically aggressive sexual pass at a veterinary technician with whom he worked had committed sexual harassment in violation of the Michigan Civil Rights Act. In rejecting the defendant's argument that a hostile work environment discrimination claim could not be established on the basis of a single incident, the court stated:
[A] female plaintiff states an actionable claim for sex discrimination caused by hostile-environment sexual harassment under the state Civil Rights Act where she alleges conduct of a sexual nature that a reasonable woman would consider to be sufficiently severe or pervasive to alter the conditions of employment by substantially interfering with her employment or by creating an intimidating, hostile, or offensive employment environment. Under this standard, the required showing of the severity of the harassing conduct will vary inversely with the pervasiveness of the conduct under the totality of the circumstances. Accordingly, we hold that a single incident could be sufficiently severe under some circumstances to support a finding that a reasonable woman's employment was substantially interfered with or that an intimidating, hostile, or offensive employment environment had been created. We believe that in some situations the mere presence of the harasser who has engaged in particularly offensive conduct can create a hostile work environment. [Id. 471 N.W.2d at 664-65; citations omitted].
Similarly, in Vance v. Southern Bell Telephone & Telegraph Co., 863 F.2d 1503, 1510-11 (11th Cir.1989), the court held that two incidents in which a noose was found hung over the work station of a black plaintiff were sufficiently severe to establish a jury question as to whether he had been subject to a racially hostile work environment:
[T]he determination of whether the defendant's conduct is sufficiently "severe and pervasive" to constitute racial harassment does not turn solely on the *655 number of incidents alleged by the plaintiff. In a recent hostile environment harassment case, the Sixth Circuit explained that drawing a formal line between "isolated incidents" and a "pattern of harassment" is not helpful to the analysis.
....
Thus, in order to determine whether a hostile environment is severe enough to adversely affect a reasonable employee, the law requires that the finder of fact examine not only the frequency of the incidents, but the gravity of the incidents as well.
And in Daniels v. Essex Group, Inc., supra, 937 F.2d at 1273-74, the court observed that:
The number of instances of harassment is but one factor to be considered in the examination of the totality of the circumstances.... [A]n employer may not rebut a claim simply by saying that the number of incidents alleged is too few.
See also Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1232 (3d Cir.1988).
I agree with the reasoning of Vance, Radtke and Daniels and therefore would expressly reject the "pervasive and regular" test of Andrews as an independent requirement to establish a hostile work environment discrimination claim. Instead, consistent with the EEOC's regulations, I would treat the pervasiveness, regularity and severity of any alleged sexually harassing conduct as part of the "totality of the circumstances" which must be reviewed to determine whether a hostile work environment discrimination claim has been established.

III
The third Andrews test is that alleged sexual harassment must be shown to have "detrimentally affected the plaintiff." However, our cases indicate that a discrimination claim may be established without the complaining party showing that he or she has been "detrimentally affected" by discriminatory conduct. For example, in Polk v. Cherry Hill Apartments, Inc., 118 N.J. Super. 106, 107, 286 A.2d 712 (App.Div.), modified in other respects, 62 N.J. 55, 298 A.2d 68 (1972), we held that black "testers" could pursue a claim for unlawful discrimination in the rental of apartments even though they had no actual intent to rent an apartment. The reasons for permitting a *656 party who has not been personally affected by unlawful discrimination to pursue a claim were aptly expressed in Jackson v. Concord Co., 54 N.J. 113, 124-25, 253 A.2d 793 (1969):
Even in the case of an individual complainant, it is plain that the public interest is also involved. Discrimination, by its very nature, is directed against an entire class in the particular circumstances and wrongful conduct against a complaining individual is indicative of such a state of mind in the wrongdoer against the class.... So the law seeks not only to give redress to the individual who complains, but moreover to eliminate and prevent all such future conduct ... by enjoining further discriminatory practices as to all persons, as well as to deter others similarly situated from engaging or continuing to engage in such courses of conduct.
I would apply these principles to hostile work environment sex discrimination claims and hold that a plaintiff is not required to show that he or she has been "detrimentally affected" by sexually harassing conduct.[1] Some persons are less sensitive than others and may be only annoyed by sexually harassing conduct which could cause serious psychological harm to co-employees. Indeed, a person who has not been detrimentally affected by sexually harassing conduct may be more likely to come forward and complain about that conduct than a co-employee who has suffered serious psychological harm. Of course, a party who has not been detrimentally affected by discriminatory conduct may be entitled to only nominal damages, but this should not prevent that person from vindicating the broader public interest in preventing violations of the LAD by securing injunctive relief against a discriminatory workplace environment.

IV
The fourth Andrews requirement that a plaintiff show that alleged sexually harassing conduct "would detrimentally affect *657 a reasonable person of the same sex in that position" is similar to the requirement of the EEOC guidelines, that alleged sexual harassing conduct must be shown to have "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." The only difference is that the EEOC guidelines set forth a more specific description than the fourth Andrews test of the kinds of conduct which may be found to constitute sexual harassment and therefore in my view provide more guidance regarding the kinds of conduct which constitute unlawful sexual harassment. However, I reiterate, as discussed on page 649 of this opinion, that section 1604.11(a)(3) should not be read to limit hostile work environment sex discrimination to sexual advances or other conduct of a sexual nature but rather to extend to "any harassment or other unequal treatment of an employee ... that would not occur but for the sex of the employee." McKinney v. Dole, supra, 765 F.2d at 1138.
In addition, while the fourth Andrews test correctly indicates that the general test for hostile work environment sex discrimination should be the effect of workplace conduct on "a reasonable person of the same sex in that position," in my view the LAD should be read to extend protection in some limited circumstances to a supersensitive person who is offended by conduct which would not be offensive to a reasonable person of his or her sex. If an employer obtains actual knowledge that an employee is especially sensitive to sexually suggestive comments or other conduct directed at the employee because of his or her sex, the LAD may be reasonably construed to prohibit the continuation of that conduct solely for the purpose of harassment of the employee, because an employer has no legitimate business interest in conduct which is specifically intended to harass an employee. The EEOC guidelines appear to reflect this view by defining sexual harassment to include conduct which has the "purpose" of "creating an intimidating, hostile, or offensive working environment."

*658 V
The majority rejects the fifth Andrews test, which requires a plaintiff to establish "the existence of respondeat superior liability," and holds that an employer is strictly liable for compensatory damages awarded for sexual harassment "carried out in the workplace by a supervisory employee on a subordinate" (op. at 641).
I agree that an employer should be held "responsible" for sexual harassment committed by its supervisory employees upon their subordinates. See Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 904-05 (11th Cir.1988); College-Town v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 508 N.E.2d 587, 593 (1987); see also Fuchilla v. Layman, 109 N.J. 319, 340-41, 537 A.2d 652 (Handler, J., concurring), cert. denied, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). However, I do not believe this "responsibility" should automatically make the employer liable for every form of compensatory damages which may be awarded.
The decisions of our courts have indicated that awards of compensatory damages under the LAD are subject to certain limitations. The primary section of the LAD dealing with remedies is N.J.S.A. 10:5-17, which provides in pertinent part that "[i]f ... the director shall find that the respondent has engaged in any unlawful employment practice, ... the director shall issue ... an order requiring such respondent to cease and desist from such unlawful employment practice ... and to take such affirmative action, including, but not limited to ... reinstatement ..., with or without back pay, as, ... in the judgment of the director, will effectuate the purpose of this act." In Jackson v. Concord Co., supra, 54 N.J. at 125-28, 253 A.2d 793, the Court held that N.J.S.A. 10:5-17 authorizes the Director of the Division on Civil Rights to award compensatory damages for out-of-pocket financial losses incurred as a result of unlawful discrimination. In Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 410-16, 301 A.2d 754 (1973), the *659 Court extended its holding in Jackson and concluded that N.J.S.A. 10:5-17 authorizes the Director to award damages for pain and suffering caused by unlawful discrimination. However, the Court limited this authority to cases where the award of such damages constitutes only "incidental" and not the "primary" relief sought by the aggrieved party:
But it would seem entirely evident that the recognition of administrative authority to make minor or incidental awards need not carry with it any authority to entertain a matter where, because of the severity of the consequential injury and the extensiveness of the claim, the item of damages has become primary and the other relief incidental rather than the reverse. Surely there is nothing incompatible in concluding that while the Legislature contemplated that the Director would have authority to award compensatory damages for pain and suffering as well as economic loss, his authority would be confined to an award which truly constituted only "incidental relief" (Jackson, supra, 54 N.J. at 126 [253 A.2d 793]) rather than a primary item. [Id. at 413, 301 A.2d 754].
Recently, in Shaner v. Horizon Bancorp., 116 N.J. 433, 439, 561 A.2d 1130 (1989), the Court reaffirmed this limitation upon the Director's authority to award monetary relief, stating that "the administrative award of monetary damages should not be `a primary item' of relief, [Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. at 413, 301 A.2d 754], but must be only ancillary to and correlated with the grant of broader remedies, which in combination are `reasonably calculated to eliminate the effects of the discrimination.' Id. at 416 [301 A.2d 754]."
When an aggrieved party files a discrimination complaint in the Superior Court instead of the Division on Civil Rights, the court must exercise the same discretionary authority regarding remedies which the LAD reposes in the Director of the Division on Civil Rights. Shaner v. Horizon Bancorp., supra, 116 N.J. at 440, 561 A.2d 1130; Gray v. Serruto Builders, Inc., 110 N.J. Super. 297, 300-01, 306-12, 265 A.2d 404 (Ch.Div. 1970). As the Court explained in Shaner:
Courts, therefore, exercise an authority that parallels the Division's enumerated administrative powers, which are directed to the rectification of work-place discrimination through a full range of remedies. Thus, awards that include monetary damages as a constituent but incidental aspect of broader remedial *660 relief have long been recognized in judicial actions under the LAD. [116 N.J. at 440, 561 A.2d 1130].
The Court in Shaner also stated that although "court actions can allow more extensive individual relief in terms of monetary damages than might otherwise obtain in an administrative proceeding, id. at 441, 561 A.2d 1130, any "[m]onetary awards that may be made under the LAD have a distinctive equitable cast" and must be "tailored to redressing the special, individualized effects of discrimination, such as humiliation and mortification, and thus serve also as a deterrent against future discrimination." Id. at 446, 561 A.2d 1130.
Subsequent to Shaner, the Legislature enacted chapter 12 of the Laws of 1990, which among other things amended N.J.S.A. 10:5-13 to provide that when a claim under the LAD is filed in the Superior Court "[a]ll remedies available in common law tort actions shall be awardable to prevailing plaintiffs." Chapter 12 also provided that "[t]his act shall take effect immediately and shall apply to any action pending on that date." L. 1990, c. 12, § 5. Since this legislation was signed into law on April 12, 1990, and the trial of this case did not begin until June 6, 1990, chapter 12 is applicable to this litigation. Consequently, plaintiff is entitled to seek not only the equitable relief discussed in Shaner but also "all remedies available in common law tort actions." N.J.S.A. 10:5-13.
However, it seems to me that an employer's vicarious liability for damages which are essentially equivalent to a common law tort recovery may be more limited than its liability for equitable remedies. Since N.J.S.A. 10:5-13 provides that "[a]ll remedies available in common law tort actions shall be awardable," I would conclude that claims for any compensatory damages which are not equitable in nature should be subject to common law rules of liability, including general principles of agency law. The equitable remedies authorized by N.J.S.A. 10:5-17 are primarily designed to redress the effects of past discrimination *661 and "to eliminate and prevent all such future conduct." Jackson v. Concord Co., supra, 54 N.J. at 125, 253 A.2d 793. Consequently, an employer generally must be responsible for such remedies in order for enforcement of the LAD to be fully effective. But an award of damages comparable to what could be obtained in a common law tort action is designed primarily to compensate the individual victim and should be subject to the same limitations as would apply in a tort action.
The difficulty I have with making an employer automatically liable for any compensatory damages awarded for hostile work environment sexual harassment may be illustrated by hypothesizing a case where a supervisor rapes one of his subordinates at the workplace. It would be consistent with the broad objectives of the LAD to hold the employer responsible for this conduct and to require it to take appropriate remedial measures, such as discharging the supervisory employee and continuing to pay the victim for any time lost from work. However, it may be unjust also to impose liability upon the employer for other forms of compensatory damages which are substantially equivalent to the damages awardable in a common law tort action and for which the employer would not have liability under general principles of agency law. See Restatement (Second) of Agency §§ 219, 228-37 (1957).
Therefore, I cannot join in the majority opinion insofar as it indicates that an employer would necessarily be jointly liable for all compensatory damages awarded against a supervising employee under the LAD.

VI
Some additional comments regarding the general subject of damages are also appropriate. Plaintiff does not seek reinstatement with Toys `R' Us, the demotion or transfer of Baylous or an order designed to improve Toys `R' Us's procedures *662 for dealing with sexual harassment claims. Rather, she contends that Toys `R' Us's alleged violation of the LAD has disabled her from working and consequently that she is entitled to substantial compensatory damages for back pay and future lost pay. Consequently, the trial court should be given additional guidance regarding the criteria for a back pay award in a hostile work environment discrimination case.
Although back pay is awarded almost as a matter of course to a person who has been denied employment or terminated for a discriminatory reason, see Goodman v. London Metals Exchange, Inc., supra, 86 N.J. at 34, 429 A.2d 341, an employee who has taken the initiative in terminating his or her employment will be awarded back pay only if he or she can show that the employer's discriminatory conduct has resulted in a "constructive discharge." Derr v. Gulf Oil Corp., 796 F.2d 340 (10th Cir.1986); Easter v. Jeep Corp., 750 F.2d 520, 522 (6th Cir.1984); Goss v. Exxon Office Systems, Co., 747 F.2d 885, 887-88 (3d Cir.1984). And an employer will be found to have constructively discharged an employee only if acts of discrimination for which an employer is responsible "make working conditions so intolerable that a reasonable employee would be forced to resign." Goss v. Exxon Office Systems, Co., supra, 747 F.2d at 887; accord Hirschfeld v. New Mexico Corrections Dept, 916 F.2d 572, 580 (10th Cir.1990); Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1317 (11th Cir.1989); Derr v. Gulf Oil Corp., supra, 796 F.2d at 344; Campbell v. Kansas State University, 780 F. Supp. 755, 765-66 (D.Kan. 1991); see generally Martin W. O'Toole, Note, Choosing a Standard for Constructive Discharge in Title VII Litigation, 71 Cornell L.Rev. 587 (1986); Sheila Finnegan, Comment, Constructive Discharge Under Title VII and the ADEA, 53 U.Chi.L.Rev. 561 (1986); Annotation, Circumstances in Title VII Employment Discrimination Cases (42 U.S.C.S. §§ 2000 et seq.) Which Warrant Finding of "Constructive Discharge" of Discriminatee *663 Who Resigns Employment, 55 A.L.R.Fed. 418 (1981).
This opinion does not provide a suitable occasion for an exhaustive discussion of the considerations relevant to whether hostile work environment sexual harassment has resulted in a constructive discharge. However, I believe that an employee who has been subjected to a hostile working environment generally should have an obligation to take reasonable measures to remain employed, such as requesting the employer to correct the offensive conditions, rather than simply quitting. I note that our decisions in the field of unemployment compensation hold that an employee has the responsibility to do what is necessary and reasonable in order to remain employed. See, e.g., Domenico v. Board of Review, 192 N.J. Super. 284, 288, 469 A.2d 961 (App.Div. 1983); Zielenski v. Board of Review, 85 N.J. Super. 46, 54, 203 A.2d 635 (App.Div. 1964). In my view, we should follow a similar approach with respect to claims of constructive discharge under the LAD. Therefore, if defendants are found to have violated the LAD, the trial court should consider the nature of the sexual harassment, the closeness of the working relationship between the harasser and the victim, whether the employee has resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances, in determining whether plaintiff's working conditions were so intolerable that a reasonable employee would have been forced to resign.
Furthermore, while I would reject the five Andrews tests for determining whether an employer has violated the LAD for the reasons expressed in the earlier sections of this opinion, some of those tests may be helpful in determining whether a violation of the LAD has resulted in a "constructive discharge." For example, an employee who was subject to discriminatory treatment which was "pervasive and regular," rather than only isolated and occasional, may be better able to establish that working conditions became "so intolerable that a reasonable *664 employee would be forced to resign." Cf. Levendos v. Stern Entertainment, Inc., supra, 860 F.2d at 1232. Likewise, if management totally rebuffs an employee's charges of discriminatory working conditions, instead of investigating them and, if substantiated, instituting appropriate corrective measures, an employee's claim of constructive discharge is more likely to be sustained. As Justice Marshall pointed out in his dissenting opinion in Meritor Savings Bank v. Vinson, supra, 477 U.S. at 78, 106 S.Ct. at 2411, 91 L.Ed.2d at 66: "Where a complainant ... seeks backpay on the theory that a hostile work environment effected a constructive termination, the existence of an internal complaint procedure may be a factor in determining not the employer's liability but the remedies available against it. Where a complainant without good reason bypassed an internal complaint procedure she knew to be effective, a court may be reluctant to find constructive termination and thus to award reinstatement or backpay."
Accordingly, I concur in the majority's judgment reversing the dismissal of plaintiff's claims under the LAD and remanding those claims for further consideration by the trial court. I also concur in the majority's disposition of plaintiff's other claims. However, I dissent from the majority's directions to the trial court regarding the criteria it should apply in reconsidering plaintiff's claims under the LAD.
NOTES
[1] There does not appear to have been significant consideration by the parties or the trial judge as to the appropriate items to be considered in an award of compensatory damages for sexual harassment of a worker. We invite attention to the several concurring opinions in Byrd v. Richardson-Greenshields Sec., Inc., 552 So.2d 1099 (Fla. 1989). The trial judge must also carefully evaluate whether the course of action plaintiff followed in resigning her position and incurring substantial loss of income was reasonably warranted by the harassment she allegedly suffered. This assessment is to be made against the background of the alternate placement offered to plaintiff and whether it would have been reasonable for her to have pursued alternatives to resignation.
[1] Of course, if the harasser is the employer's chief executive officer or other upper echelon executive, then notice probably would be futile. In such a case the harasser may be deemed to be acting for the employer because of his exalted position.
[1] An employer may be able to show by way of defense that a particular employee "welcomed" alleged sexually harassing conduct and therefore was not adversely affected in the terms, conditions and privileges of his or her employment. Cf. Meritor Savings Bank v. Vinson, supra, 477 U.S. at 68-69, 106 S.Ct. at 2406-07, 91 L.Ed.2d at 60-61.