988 A.2d 604 (2010)
412 N.J. Super. 17
Joseph A. DONELSON, Plaintiff, and
John Seddon, Plaintiff-Respondent/Cross-Appellant,
v.
DuPONT CHAMBERS WORKS, Defendant-Appellant/Cross-Respondent, and
Paul Kaiser, Defendant.
Docket No. A-2028-08T1
Superior Court of New Jersey, Appellate Division.
Argued December 7, 2009.
Decided February 24, 2010.
*607 David S. Fryman argued the cause for appellant/cross-respondent (Ballard Spahr Andrews & Ingersoll, LLP, attorneys; Mr. Fryman, Jennifer L. Sova and William J. Simmons, on the briefs).
Neil Mullin argued the cause for respondent/cross-appellant (Smith Mullin, PC, attorneys; Mr. Mullin and Nancy Erika Smith, of counsel and on the brief).
Before Judges LISA, BAXTER and COBURN.
The opinion of this court was delivered by
BAXTER, J.A.D.
This is an appeal by defendant DuPont Chambers Works[1] from the denial of its post-trial motions after a jury awarded DuPont's former employee, plaintiff John Seddon, $724,000 as compensatory damages and $500,000 as punitive damages, based upon the jury's finding of a violation of plaintiff's rights under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. The entire amount of the jury's award of compensatory damages was for plaintiff's economic loss. The jury awarded nothing for his emotional pain and suffering. Defendant also appeals from the trial judge's award of attorney's fees to plaintiff in the amount of $523,289.
On appeal, defendant argues that the court erred when it accepted plaintiff's argument that he was entitled to an award of back and front pay without being required to prove a constructive discharge or an actual termination of his employment. Plaintiff cross-appeals from the court's decision to reduce the amount awarded for attorney's fees by fifty percent.
We agree with defendant's claims and hold that: 1) plaintiff was not entitled to an award for back and front pay because DuPont neither terminated plaintiff nor constructively discharged him from his employment; and 2) because plaintiff was not entitled to an award of economic damages, the denial of DuPont's motion for judgment notwithstanding the verdict (JNOV) was error, as was the award of counsel fees. We conclude that, like a cause of action for economic damages arising under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, a plaintiff seeking lost pay after a separation from employment that results from a violation of CEPA must prove a constructive discharge or an actual termination of employment before being entitled to an award of such lost pay. Because the trial judge erroneously accepted plaintiff's argument that the jury need not be instructed on constructive discharge or required to so *608 find, we now vacate the $724,000 award of economic damages, as well as the $500,000 punitive damages award, and remand for the entry of judgment in favor of defendant.

I.
Plaintiff was a chemical plant operator at the DuPont Chambers Works plant in Deepwater. He filed suit, contending that DuPont and its employees had retaliated against him after he made safety complaints, one to the Occupational Safety and Health Administration (OSHA) and the other to DuPont management. He maintained that the reprisals by DuPont consisted of: imposing restrictions on him, not imposed on others, concerning his use of vacation, sick time and personal leave days; falsely accusing him of failing to complete required employee training; accusing him of failing to attend some of the safety meetings in the summer, even though DuPont had always excused him from such summer meetings in the past; falsely accusing him of being lazy and describing him in an internal memorandum as "not [one of] our best performers"; ordering him to notify a supervisor when and where he was going to lunch, a rule not imposed on other operators; and describing him in an e-mail as a "very high maintenance" employee over whom management should maintain a "watchful eye."
According to plaintiff's testimony at trial, the reprisals escalated over time, culminating in DuPont filing a disciplinary complaint against plaintiff alleging that he had "failed" to perform one of the principal tasks required of a chemical plant operator, namely taking a sample of the caustic solution in the principal piece of manufacturing equipment at the plant and then falsifying the solution levels in his daily log sheet by "enter[ing] `made up' information." DuPont issued plaintiff a verbal warning, which was recorded in his personnel file.
The day after plaintiff received the verbal warning, which he insisted was entirely unjustified and therefore retaliatory, he filed a complaint on DuPont's employee hotline alleging that DuPont's senior managers were harassing him for having filed the safety complaint with OSHA, and had done so both by singling him out for lunch-time and vacation restrictions, and by refusing to investigate his earlier complaints of a hostile work environment. Plaintiff testified that DuPont's rejection of the complaint he filed on the employee hotline was further evidence of the company's pattern of retaliatory behavior.
Plaintiff testified to another instance of significant retaliation by DuPont for his whistleblowing activities, namely forcing him to undergo an unwarranted, intrusive and humiliating mental status examination by a DuPont employee. The consequences of that examination were dire, as DuPont relied upon the clinician's findings[2] to force plaintiff to take an eight-week paid disability leave. According to plaintiff, not only was the forced leave devastating from an emotional perspective, but it resulted in a loss of overtime compensation that he would otherwise have earned had he not been forced to take the leave.
Furthermore, the clinician's conclusion that plaintiff was too emotionally unstable to work was later rejected in three independent evaluations, which were conducted at the behest of the DuPont clinician who had rendered the original report. All three, a psychologist and two psychiatrists, *609 opined that plaintiff presented no danger of physical violence and recommended that plaintiff be permitted to return to work. Even though their findings raised doubt about the accuracy of the DuPont clinician's earlier conclusions, DuPont notified plaintiff that he would be placed on probation and was subject to quarterly performance evaluations.
Plaintiff testified that when he returned to work on May 28, 2004, he was assigned to a different shift with a new supervisor. Plaintiff claimed he could not earn the same overtime pay on the new shift, although DuPont's witnesses testified that both shifts had the same overtime opportunities. Before his suspension, plaintiff earned "[a]round [$]30,000 a year" in overtime. Approximately one year after he returned to work, plaintiff was given permission to work overtime, which he did twice. The second time, he almost had an "anxiety attack," and had to leave when defendant Paul Kaiser appeared, because of the problems plaintiff had had with Kaiser in the past. Plaintiff never worked that shift again.
Plaintiff testified that his two-month suspension made him feel "[s]ad, hopeless," as if his "life was at an end." He felt "kicked to the curb," "worthless," "[b]eaten," and "embarrassed," and wondered if his co-workers considered him "crazy." He could not eat and had trouble sleeping. After returning to work in June 2004, plaintiff worried about new allegations and experienced anxiety "every day" as he approached the entrance gate. He sought psychiatric treatment, and began taking anti-depressant medication. In February 2005, plaintiff filed suit against DuPont and Kaiser.[3]
In January 2007, plaintiff began a voluntary six-month leave of absence. He retired on December 31, 2007, with a disability pension from DuPont. At the time of trial, plaintiff testified that he was earning $50,000 to $60,000 less per year on retirement than he had earned with his salary and overtime, and he presented the testimony of an economic expert who apparently quantified his economic loss.[4] Although plaintiff believed DuPont "ruined" him, he testified he would do the same thing again if he observed the same dangerous conditions he had reported to DuPont management.
At the start of trial, prior to opening statements, DuPont moved to bar plaintiff from introducing evidence of economic loss because he had not alleged constructive discharge in his pleadings. According to DuPont, plaintiff "stood up here at oral argument in [his] summary judgment papers and said, `we're not alleging constructive discharge.' And the case law is clear, no constructive discharge, [then] no back or front pay."[5] DuPont elaborated:
Here you had somebody who chose to retire. And he'll get up on the stand and he'll argue that he [is] still suffering emotional damages from that. And we're not seeking to bar that type of testimony. But with respect to back and front pay, Mr. Seddon without a constructive discharge claim is not legally entitled to receive [such damages].
*610 In response to DuPont's argument, plaintiff's counsel maintained that plaintiff "may not have pled constructive discharge, [and] I never considered it as a constructive discharge case for Mr. Seddon." He proceeded to argue that "there's another way to get economic damages. If I'm the boss and I abuse my employee to the point where my employee has a nervous breakdown, and has to go out on disability, I caused that individual." After the judge commented, "[t]hat's a constructive discharge, if you ask me," plaintiff responded:
Well, it can also be a constructive discharge, but doesn't have to be. It's simple causation of damages. I did something bad. I violated the law. I retaliated against you. I treated you so poorly that you broke down.
The difference between this and a constructive discharge is, in a constructive discharge, the employee doesn't have to have a nervous breakdown....
. . . .
It's a terrible work place, intolerable, employee walks away, leaves. That's one scenario. So, that employee would only have a constructive discharge theory, only.
But when you have a terrible work circumstance and it causes the employee to have a nervous breakdown so he can no longer work, and so, then he has to go out on a reduced disabilitya retirement, just natural, just normal law, common law causation says of course he should get all the damages that flow from that.
. . . .
Again, it's just common sense[,] if I abuse my employee to the point that he has a nervous breakdown, and as a result of that he has to go on a disability pension, he can't earn a living at a higher level, I caused those injuries.
At the conclusion of this oral argument, which occurred on January 14, 2008, the judge reserved decision, commenting that he would render a decision on DuPont's motion the next morning. The record does not include a transcript of the judge's ruling on the motion; however, as is apparent from the trial record, and from both parties' briefs, the judge denied the motion.[6] On February 7, 2008, during the charge conference, DuPont renewed its motion to bar plaintiff's evidence of economic loss. The judge again denied DuPont's motion. The judge's charge to the jury did not include an instruction on the elements of constructive discharge, nor did the verdict sheet ask the jury if DuPont's conduct constituted a constructive discharge.
Instead, the jury verdict sheet asked the jury if plaintiff had proven by a preponderance of the evidence "that DuPont retaliated against him in violation of New Jersey's Conscientious Employee Protection Act," to which the jury answered "yes." The next question asked the jury how much money it awarded plaintiff "for economic losses" he suffered as a proximate result of DuPont's violations of CEPA, to which the jury answered "$724,000." In response to the next question, which asked how much the jury awarded for plaintiff's "pain and suffering" proximately caused by DuPont's violations of CEPA, the jury answered "0." The jury awarded plaintiff an additional $500,000 in punitive damages.
On April 11, 2008, the judge denied DuPont's post-judgment motions for JNOV and for remittitur. In a written opinion, he addressed DuPont's claim that in the absence of proof of constructive discharge, *611 plaintiff was not entitled to an award of back pay and front pay. The judge observed that the applicable precedents that bar damages for economic loss in the absence of constructive discharge have all arisen in the context of alleged violations of the LAD. He reasoned that CEPA contains additional language, not included in the LAD, providing that "[t]he court shall also order, where appropriate and to the fullest extent possible ... the compensation for all lost wages, benefits and other remuneration...." The judge reasoned that unlike the LAD, the CEPA statute creates specific remedies that should be ordered "`to the fullest extent possible'" to a prevailing plaintiff. See N.J.S.A. 34:19-5(d). A confirming order was entered on May 16, 2008. In that order, the judge also denied plaintiff's additur motion.

II.
We turn first to DuPont's claim that the judge erred by denying its motion for JNOV on plaintiff's CEPA claim because there was no causal connection between his whistle-blowing activity and any adverse employment action. Our determination that plaintiff was not entitled to an award of economic damages in the absence of a constructive discharge makes it unnecessary for us to address DuPont's causal connection claim.
We turn now to the central issue raised by this appeal. DuPont contends the trial court erred by denying its motion to vacate or remit the jury's award of economic damages because plaintiff failed to establish any legal entitlement to back or front pay. Specifically, it argues that plaintiff cannot recover economic damages because there was no actual or constructive discharge. DuPont maintains that the remedies provision in CEPA, as in the LAD, prohibits recovery for such damages, and that CEPA's legislative history expressly provides that back and front pay would not be available unless a plaintiff's employment was terminated. Finally, DuPont argues that plaintiff did not qualify for economic damages because the jury found no compensable emotional pain and suffering.
DuPont did not argue in the trial court, and has not argued on appeal, that the jury award of $724,000 was excessive or that it should be reduced. Instead, DuPont contends, as it did in the Law Division, that the court should have vacated the award because CEPA does not authorize an award of lost wages in the absence of a constructive or actual discharge. Consequently, the trial court's opinion did not address whether to remit the award, but instead focused on whether the award of economic damages should be set aside.
CEPA creates a statutory cause of action for retaliatory discharge. Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 103, 961 A.2d 1167 (2008). Its purpose is to protect and encourage employees who report illegal or unethical workplace activities. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994). CEPA prohibits an employer from taking retaliatory action against employees "`who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.'" Dzwonar v. McDevitt, 177 N.J. 451, 464, 828 A.2d 893 (2003) (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94, 707 A.2d 1000 (1998)). Because CEPA is remedial legislation, it must be liberally construed to effectuate its important social goal. Id. at 463, 828 A.2d 893; Abbamont, supra, 138 N.J. at 431, 650 A.2d 958.
CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse *612 employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). Retaliation is not limited to a single discrete action, but may include "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct." Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448, 828 A.2d 883 (2003). An adverse employment action may consist of a reduction in pay, or the withdrawal of benefits formerly provided. Maimone v. City of Atlantic City, 188 N.J. 221, 235-36, 903 A.2d 1055 (2006).
CEPA protects employees from retaliation for three kinds of whistleblowing conduct, of which two are relevant here: disclosure to a supervisor or a public body, N.J.S.A. 34:19-3(a); or objection or refusal to participate in any activity that is illegal, fraudulent or criminal, or incompatible with a clear mandate of public policy, N.J.S.A. 34:19-3(c). To maintain a cause of action under either of these subsections, a plaintiff must establish:
(1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he or she performed whistleblowing activity described in N.J.S.A. 34:19-3[a], c(1) or c(2); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action.
[Kolb v. Burns, 320 N.J.Super. 467, 476, 727 A.2d 525 (App.Div.1999).]
CEPA, like the LAD, is a civil rights statute. Id. at 477, 727 A.2d 525. Both statutes seek "to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." Abbamont, supra, 138 N.J. at 418, 650 A.2d 958.
CEPA's remedy provision, N.J.S.A. 34:19-5, provides in relevant part:
Upon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction. Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any legal or equitable relief provided by this act or any other statute. The court shall also order, where appropriate and to the fullest extent possible:
a. An injunction to restrain any violation of this act which is continuing at the time that the court issues its order;
b. The reinstatement of the employee to the same position held before the retaliatory action, or to an equivalent position;
c. The reinstatement of full fringe benefits and seniority rights;
d. The compensation for all lost wages, benefits and other remuneration; and
e. The payment by the employer of reasonable costs, and attorney's fees.
[Emphasis added.]
The remedies provision under the LAD, N.J.S.A. 10:5-13, states:
Any complainant may initiate suit in Superior Court under this act without first filing a complaint with the division or any municipal office. Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort *613 actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute. Prosecution of such suit in Superior Court under this act shall bar the filing of a complaint with the division or any municipal office during the pendency of any such suit.
For purposes of the laws against discrimination or retaliatory discharge, an employee is expected to take all reasonable steps necessary to remain employed. Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 28, 803 A.2d 611 (2002) (addressing constructive discharge under the LAD). A claim for constructive discharge under the LAD requires proof of egregious circumstances. Ibid. The employer's conduct must be "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Ibid. The proofs required to sustain the resignation are not subjective in nature, but are instead objective, i.e. whether a "reasonable person" would be forced to resign. Ibid.
DuPont relies on a series of cases under the LAD to argue that where an employer's conduct, however wrongful, did not result in an actual or constructive discharge, the employee was not eligible to receive an award for lost wages. For example, in Padilla v. Berkeley Educational Services of New Jersey, 383 N.J.Super. 177, 178, 891 A.2d 616 (App.Div.2005), the plaintiff alleged wrongful termination of her employment by way of constructive discharge. Although the jury found that the defendant had violated the LAD by engaging in unlawful discrimination on account of the plaintiff's pregnancy, it concluded that the discriminatory conduct was not adequate as a basis for justifying the plaintiff's resignation. Id. at 183, 891 A.2d 616.
In Padilla, we explored the difference between the purely subjective elements of a claim for emotional distress damages, and the objective elements of a claim for constructive discharge that causes a wage loss. Id. 183-84, 891 A.2d 616. We held that in light of the jury's rejection of the plaintiff's constructive discharge claim, she had no entitlement to an award for lost wages:
[W]e take as a given that defendant had engaged in unlawful discrimination on account of plaintiff's pregnancy, but that the discriminatory conduct was not adequate as a basis for justifying plaintiff's resignation. Because the jury had been properly instructed on the issue of constructive discharge, but rejected that claim, the question of plaintiff's economic damages did not survive the verdict. There was no proof in the record that plaintiff had suffered any economic losses as a result of defendant's discriminatory conduct beyond those engendered by her resignation. Thus, with its rejection of the constructive discharge theory, the jury had no basis to consider plaintiff's claims for back pay, front pay, loss of benefits or other economic damages.

[Ibid. (emphasis added).]
Thus, we held that without constructive discharge the jury had no basis to consider the plaintiff's claims for economic damages. We recognized that although the jury's rejection of the plaintiff's constructive discharge claim barred her from receiving an award of economic damages for any wage loss, she was nonetheless entitled to an award for emotional pain and suffering. Id. at 184, 891 A.2d 616. We reasoned that harassing or unlawful treatment causing an employee to suffer an emotional injury may be "sufficient to cause a claimant compensable emotional *614 distress but insufficient to justify a resignation." Ibid.
Here, the jury awarded plaintiff economic damages in the absence of a constructive discharge or an actual termination. Thus, if Padilla applies to CEPA claims, rather than merely LAD claims, the jury's award cannot be sustained because in the absence of a constructive discharge, "the jury had no basis to consider plaintiff's claims for back pay, front pay ... or other economic damages." Id. at 183-84, 891 A.2d 616.
Padilla is certainly not the only case to have held, in the LAD context, that economic damages cannot be recovered where there has been no constructive discharge. See T.L. v. Toys `R' Us, Inc., 255 N.J.Super. 616, 662, 605 A.2d 1125 (App.Div. 1992)[7] (observing that "an employee who has taken the initiative in terminating his or her employment will be awarded back pay only if he or she can show that the employer's discriminatory conduct has resulted in a `constructive discharge.'" (emphasis added)); see also Woods-Pirozzi v. Nabisco Foods, 290 N.J.Super. 252, 277, 675 A.2d 684 (App.Div.1996) (noting that once the trial court properly dismissed the plaintiff's constructive discharge claim, the dismissal of the claims for back pay and front pay was required "because they depend on finding constructive discharge"). A number of federal courts have reached the same result. See Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 (3d Cir.2006), cert. denied, 551 U.S. 1141, 127 S.Ct. 2985, 168 L.Ed.2d 720 (2007); Hertzberg v. SRAM Corp., 261 F.3d 651, 659 (7th Cir.2001), cert. denied, 534 U.S. 1130, 122 S.Ct. 1070, 151 L.Ed.2d 973 (2002); Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1237 (10th Cir.2000); Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1219 (8th Cir.1997); Derr v. Gulf Oil Corp., 796 F.2d 340, 342 (10th Cir.1986); Easter v. Jeep Corp., 750 F.2d 520, 522 (6th Cir.1984); Goss v. Exxon Office Sys., Co., 747 F.2d 885, 887-88 (3d Cir.1984).
We now turn to an analysis of whether CEPA cases such as this should be treated in the same fashion as LAD cases such as Padilla and the others we have discussed. As DuPont correctly argues, New Jersey courts have construed CEPA and the LAD identically on a wide variety of substantive issues. Notably, the Court observed in Carmona v. Resorts International Hotel, Inc., 189 N.J. 354, 371, 915 A.2d 518 (2007) that "courts frequently compare CEPA to the LAD, applying the legal tests and frameworks developed under one to the other." (internal quotations and citations omitted). See also D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 123-25, 927 A.2d 113 (2007) (applying to CEPA and the LAD the same definition of an "employee" who may bring a claim); Green, supra, 177 N.J. at 448, 828 A.2d 883 (applying the LAD "continuing violation" theory to CEPA claims); Cedeno v. Montclair State Univ., 163 N.J. 473, 479, 750 A.2d 73 (2000) (applying same standards to LAD and CEPA for the effect of failing to report a prior criminal conviction on the plaintiff's claims for wrongful discharge); Abbamont, supra, 138 N.J. at 417-18, 650 A.2d 958 (applying same standards for employer respondeat superior liability); Massarano v. New Jersey Transit, 400 N.J.Super. 474, 492, 948 A.2d 653 (App.Div.2008) (holding that the burden shifting analysis under LAD should apply to CEPA); El-Sioufi v. St. Peter's Univ. Hosp. 382 N.J.Super. 145, 176, 887 A.2d *615 1170 (App.Div.2005) (applying CEPA's definition of retaliatory act to the LAD); Donofry v. Autotote Sys., Inc., 350 N.J.Super. 276, 290, 795 A.2d 260 (App.Div.2001) (noting that methods of proof and applicable burden of proof in LAD and CEPA cases are the same, as both are derived from Title VII law); Abbamont v. Piscataway Twp. Bd. of Educ., 314 N.J.Super. 293, 308-09, 714 A.2d 958 (App.Div.1998) (concluding that CEPA and LAD fee applications use same standard), aff'd, 163 N.J. 14, 746 A.2d 997 (1999). In fact, the Court has emphasized that CEPA and the LAD share the same remedial purpose, observing that "[b]oth CEPA and [the] LAD ... seek[ ] to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." Abbamont, supra, 138 N.J. at 418, 650 A.2d 958.[8]
Nothing in the legislative history of CEPA requires a contrary result. Indeed, the legislative history supports DuPont's position. A statement by the Assembly State Government Committee, which drafted the 2005 amendment to CEPA's remedial provision resulting in its current language, expressly noted that back and front pay would not be available when the plaintiff's employment was not terminated:
The bill states that the court must order, to the fullest extent possible, an injunction against continuing violations, reinstatement to employment, compensation for lost pay and costs of the case, but only where appropriate. The bill thus takes into consideration that not all of these measures are always applicable, as, for example, in a case where the employer retaliation did not include a termination of employment.

[Assembly State Government Committee Statement, Assembly No. 764, L. 1986, c. 105 (emphasis added).][9]
We thus conclude that the judge's denial of DuPont's motion for JNOV was error, as the award of economic damages for back pay, front pay and lost overtime was improper when plaintiff had not been terminated or constructively discharged.[10] We thus remand for the entry *616 of an order vacating the compensatory damages award.

III.
Next, DuPont contends the court erred by denying its motion to vacate the punitive damages, and contests the award as excessive. DuPont also argues that if the compensatory damages award is vacated, then the punitive damages award must be vacated as well. DuPont is correct. The Punitive Damages Act specifically mandates that "[p]unitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial. An award of nominal charges cannot support an award of punitive damages." N.J.S.A. 2A:15-5.13(c). See also Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J.Super. 557, 567, 916 A.2d 484 (App. Div.2007), aff'd, 194 N.J. 212, 943 A.2d 866 (2008).
Thus, because we have held that the compensatory damage award must be vacated, the award of punitive damages cannot stand. Ibid. We thus reverse the denial of DuPont's motion to vacate the punitive damages award.
Last, DuPont contends the court erred by awarding attorney's fees to plaintiff because such an award depended in part on plaintiff's recovery of economic and punitive damages to which DuPont claims he was not legally entitled. In light of our conclusion that the compensatory and punitive damages must be vacated, plaintiff is no longer a prevailing party. Thus, he is not entitled to counsel fees. Best v. C & M Door Controls, Inc., 200 N.J. 348, 355, 981 A.2d 1267 (2009). We therefore reverse the award of counsel fees to plaintiff.
In his cross-appeal, plaintiff contends the court erred by reducing his attorney's fee award by fifty percent. In light of our disposition, we need not address plaintiff's claim that the counsel fee award was insufficient, as we have determined that the counsel fee award must be vacated.

IV.
Plaintiff acknowledged on the record, during the April 11, 2008 argument of DuPont's new trial motion, that if the position he asserted was incorrect, and economic damages cannot be awarded where there has not been a constructive discharge, then he would not be entitled to a new trial. We agree. By persuading the judge to instruct the jury that it could award plaintiff damages for economic loss if it found that DuPont had committed an adverse employment action in retaliation for plaintiff's whistleblowing activityand by simultaneously persuading the judge to refrain from instructing the jury that it must also find plaintiff was constructively dischargedplaintiff was able to achieve a significant tactical advantage at trial. That tactical advantage enabled plaintiff to secure a verdict without having to satisfy one of the required elements of the very cause of action he asserted.
A litigant "`cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of *617 the trial, and if unfavorable'" at trial or on appeal, "`then [repudiate] the very procedure he sought and urged, claiming it to be error'" entitling him to a new trial. Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503, 677 A.2d 705 (1996) (quoting State v. Pontery, 19 N.J. 457, 471, 117 A.2d 473 (1955)). As the Court observed in Brett, the "rule is based on considerations of fairness and preservation of the integrity of the litigation process." Ibid.
To be clear, plaintiff has not argued on appeal that he is entitled to a new trial if we reject the position he urged at trial. Instead, he confines his argument to a demonstration that the jury instruction was correct and the verdict should be affirmed. We have nonetheless discussed Brett as support for our conclusion that with the verdict in plaintiff's favor reversed, the matter must now be remanded not for a new trial, but instead for the entry of judgment in favor of defendant.
Reversed and remanded for the entry of judgment for defendant.
NOTES
[1] Appellant's correct name is E.I. du Pont de Nemours and Co.
[2] The person who performed the examination was not a psychiatrist, but was instead a clinical social worker who also served as DuPont's employee assistance program counselor.
[3] Plaintiff voluntarily dismissed his cause of action against Kaiser on the first day of trial.
[4] The record on appeal does not include a transcript of the expert's testimony.
[5] The term "back pay" is a sum of money paid to an employee as reimbursement for financial losses already sustained as a result of the employer's misconduct. "Front pay" refers to future lost wages. Baker v. Nat'l State Bank, 353 N.J.Super. 145, 158, 801 A.2d 1158 (App.Div.2002).
[6] January 14, 2008 was a Monday. The next transcript that is part of the record begins with opening statements on Thursday, January 17, 2008.
[7] Although our decision in T.L. was affirmed in part and remanded in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626-27, 626 A.2d 445 (1993), the Court expressed no disagreement with our conclusion in T.L. that a plaintiff who was not terminated or constructively discharged could not collect lost wages.
[8] Plaintiff conceded as much during the argument on the parties' post-trial motions, when he said, "The language in the Statutes, both the LAD and CEPA, which are construed, you know, in the same way when it comes to damages in language of tort.... [T]he LAD and the CEPA ha[ve] been construed in pari materia with the LAD."
[9] The official Statement of the Senate Labor Committee contains identical language. Senate Labor Committee Statement, Senate No. 1886, L. 1986, c. 105.
[10] We recognize that plaintiff's claim for economic damagesarising from DuPont's alleged retaliatory reduction in his opportunity to earn overtime compensationis not affected by plaintiff's failure to prove a constructive discharge. This is so because any loss of overtime pay occurred before plaintiff chose to retire on a disability pension. Thus, it is theoretically possible for plaintiff's claims related to overtime pay to survive a dismissal of plaintiff's claim for loss of front pay and back pay, both of which arose after plaintiff chose to retire. Nonetheless, given the state of the record, it is impossible to determine whether any portion of the $724,000 award for economic damages is attributable to lost overtime or whether instead all of it was attributable to the loss of back and front pay.

In particular, the verdict sheet did not ask the jury to specify whether any portion of its award of economic damages was attributable to overtime; it merely asked the jury "how much [it] award[ed] plaintiff, Jack Seddon, for economic losses he has suffered as a proximate result of DuPont's [conduct]." Second, the record on appeal does not include a transcript of the testimony of plaintiff's economic loss expert, and we are therefore unable to determine whether he rendered any opinion on the subject of overtime. Third, plaintiff's own testimony on the subject was inconclusive. He testified that he "generally" earned $30,000 per year from overtime, but when DuPont suspended him for "seven weeks and six days," he received only his base pay; however, he never provided a precise dollar amount of lost overtime pay for that period. Moreover, as we have already noted, plaintiff claimed that when he returned to work and was assigned to a different shift, he had no opportunities to earn overtime pay, but DuPont's witnesses disputed this claim. We cannot determine whom the jury believed on this subject. Last, plaintiff himself does not claim that the loss of overtime pay entitles him to a new trial. For all of these reasons, we conclude that the record cannot support a right to a new trial on the subject of lost overtime pay.