**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0490-22

JAMES WARNET,

     Plaintiff-Appellant,

v.

BOROUGH OF BERGENFIELD,

     Defendant-Respondent.

_____

        Argued September 18, 2024 – Decided August 22, 2025

        Before Judges DeAlmeida and Puglisi.

        On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5351-19.

        Charles J. Sciarra argued the cause for appellant (Sciarra & Catrambone, LLC, attorneys; Matthew R. Curran, of counsel and on the briefs).

        Joseph E. Lanzot argued the cause for respondent (Anderson & Shah, LLC, attorneys; Roshan D. Shah and Joseph E. Lanzot, of counsel and on the brief).

PER CURIAM

Plaintiff James Warnet appeals from the October 7, 2022 Law Division order granting defendant Borough of Bergenfield's motion for summary judgment and dismissing his complaint alleging retaliatory termination under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. We affirm.

I.

On or about July 18, 2017, plaintiff was hired as a law enforcement officer with the Bergenfield Police Department (BPD). As a BPD officer, plaintiff was paid by defendant. Following his hiring, plaintiff was enrolled as a recruit in the new officers' training program at the Bergen County Police Academy (the Academy), which is operated by Bergen County.

On July 21, 2017, plaintiff began attending the full-time training program at the Academy. Earlier that week, plaintiff completed various administrative tasks at BPD headquarters. On one of those days, plaintiff was permitted to leave BPD headquarters early but was paid for an eight-hour day.

During plaintiff's first full week at the Academy, which began on July 24, 2017, he and the other recruits participated in Academy-related training for more than forty hours. On July 27, 2017, plaintiff sent an email to BPD Lieutenant

2

William Duran asking how the Academy's recruits' weekly pay was calculated for overtime purposes.

Upon receiving plaintiff's email, Duran forwarded it to his supervisor, Lieutenant David Doherty, who served as liaison between BPD and the Academy recruits. Later that day, Doherty called plaintiff to confirm he was requesting overtime pay for the week of July 24, 2017. According to plaintiff's deposition testimony, during the conversation he told Doherty he "won't work for free." In response, Doherty advised plaintiff he would inform Cathy Madalone, BPD's Chief of Police, of his overtime request. Shortly thereafter, Doherty advised Madalone of plaintiff's request.

On July 28, 2017, while plaintiff was at the Academy, he was summoned to a meeting by the officer-in-charge, Lieutenant Charles Silverstein of the Bergen County Sheriff's Office (BCSO). During the meeting, Silverstein ordered plaintiff to draft a memorandum to Madalone detailing his overtime hours for the week of July 24, 2017. Plaintiff drafted the memorandum and sent it to Madalone shortly thereafter.

Madalone testified she requested the memorandum because she was aware plaintiff reported to BPD headquarters prior to starting Academy training and had been permitted to leave early one day but was paid for a full eight-hour shift.

A-0490-22

She "wanted to see what [overtime] hours [plaintiff] was talking about so that when [she] spoke to him, [she] would know what" hours were at issue.

On July 31, 2017, plaintiff spoke with Madalone by telephone. He advised her of his belief he was entitled by law to overtime pay. Madalone noted her understanding of the Academy's customary practice was that at "the beginning of the [A]cademy . . . there are . . . long hours, but at the end of the [A]cademy, they let [you] leave early." Madalone believed "basically it evens out in the end" because defendant would pay recruits for a forty-hour week while they were at the Academy, regardless of whether training exceeded or was less than forty hours.

Madalone, who heard rumors plaintiff intended to file a legal action seeking overtime pay, advised plaintiff that "if he wanted to get paid [overtime], then he certainly can." However, if he chose to do so, and was released early during a future Academy week, he would be paid only for the hours he was in Academy training. In response, plaintiff advised Madalone he "had no interest in creating issues," would withdraw the overtime memorandum, and "consider the matter dropped." Plaintiff further advised Madalone he "just wanted to make [her] aware of something."

A-0490-22

According to plaintiff, he withdrew his request for overtime, in part because Madalone told him if he was going to be paid strictly by the hours he worked, he would have to drive to BPD headquarters each day to use an official vehicle to attend the Academy and would have to return the vehicle each day to BPD headquarters before going home. According to plaintiff, use of an official vehicle would add several hours to his workday because of the distance between his home and BPD headquarters. Later that day, plaintiff sent Madalone an email stating "[a]s per our conversation, please shred my previous memo and consider the matter closed. I have no intention of pursuing the matter further. Thank you."

In early August 2017, plaintiff submitted an anonymous letter to the Bergen County Prosecutor's Office (BCPO) complaining about the Academy instructors' training procedures and tactics. Specifically, plaintiff expressed his opinion that conditions at the Academy, including wearing gear in the heat, were too strenuous and threatened the physical safety of the recruits. The instructors about whom plaintiff complained were members of the BCSO, not BPD employees.

In mid-August 2017, after receipt of the anonymous letter, the BCPO conducted an on-scene investigation at the Academy and interviewed dozens of

instructors and recruits. The BCPO did not substantiate the allegations in the letter and took no further action. However, Silverstein was removed as Officer-In-Charge of the Academy.

Neither Madalone, BPD's Deputy Chief Christopher Massey, nor any BPD superior officer had direct knowledge plaintiff authored the anonymous letter. Madalone was present at a meeting during which the BCPO told the chiefs of all Bergen County police agencies of an ongoing investigation of an anonymous report of "misdoings" at the Academy, but that training would continue. Madalone heard a rumor at the meeting plaintiff was the author of the letter.

Other BPD officers also heard rumors plaintiff wrote the anonymous letter. In addition, plaintiff told two BPD recruits who attended the Academy with him he was the author of the letter. Months later, Sergeant Fingeroth, one of plaintiff's supervisors, asked plaintiff if he was the author of the letter and BPD Police Officer Ahmed Alagha called plaintiff a "rat" and the "letter writer" in front of Fingeroth during a dispute described in greater detail below.

On December 13, 2017, plaintiff graduated from the Academy and began a twelve-month working test period as a BPD police officer. During that time, plaintiff received some positive recognition from BPD. Captain Mustafah Rabboh awarded plaintiff the "Top Cop" award four times. On May 15, 2018,

6

at a meeting of the Bergenfield governing body, Madalone presented plaintiff and six other BPD staff members with awards for their individual performances during a March 2018 home birth.

On May 29, 2018, plaintiff attended an awards dinner with Madalone as a BPD representative. Madalone testified that while plaintiff's attendance was meant to be "a reward for his good work," she also wanted him "to understand the other aspect of policing, in that it's important to be able to build connections in our community."

In July 2018, plaintiff received a salary increase. Two months later, Massey was one of several BPD superior officers to congratulate plaintiff for his actions in providing off-duty assistance to a person who had overdosed. Madalone also sent plaintiff a congratulatory text message about this incident.

However, plaintiff's job performance was also marred by his inability to accept feedback, personal conflicts with other officers, and what defendant described as his cowboyish approach to policing. From December 2017 to March 2018, plaintiff was assigned to the BPD Field Training Officer (FTO) program. As part of the program, plaintiff accompanied an experienced officer while receiving on-the-road training and evaluation.

7

Plaintiff and his FTOs completed weekly written assessments evaluating plaintiff's ongoing performance. In his report for week thirteen of the program, plaintiff's primary FTO noted: "[Plaintiff] has to improve his acceptance of feedback from other people." In addition, plaintiff was repeatedly counseled and retrained by superior officers on procedural and demeanor-related issues during his working test period.

On May 19, 2018, plaintiff had a public dispute with Alagha. While on-scene at a service call, plaintiff and Alagha engaged in a verbal dispute in the presence of civilians. During the argument, plaintiff referred to other officers calling Alagha "Angry Arab," but did not directly refer to Alagha by that name.

Following the dispute, both officers reported the incident to their immediate supervisors. Plaintiff, Alagha, and their supervisors met privately at BPD headquarters. Plaintiff and Alagha were counseled and retrained by their supervisors on how they should act toward fellow employees, especially in public. Neither plaintiff nor Alagha elected to file an internal complaint, and the officers considered the matter resolved at the end of the meeting. The supervisors did not report the incident up the chain of command and failed to document it in the BPD software system intended to monitor, identify, and address performance issues.

A-0490-22

On May 20, 2018, plaintiff conducted a warrantless search of a parked, unoccupied vehicle, in which he located a marijuana grinder. Plaintiff did not activate his patrol vehicle dashboard camera and microphone until seventeen minutes into the search and after he seized the grinder.

During the search, plaintiff's backup officer contacted Fingeroth, alerting him of the search and expressing his concern about its legality. When Fingeroth arrived at the scene, he asked plaintiff to explain the basis for the search. Plaintiff responded that he "know[s] [his] case law." Following additional discussion, plaintiff admitted he "put the cart before the horse" in searching the unoccupied vehicle and seizing the contraband without first identifying who was in legal possession of the vehicle. Plaintiff admitted he had no suspect to charge for possessing the grinder. Fingeroth subsequently counseled and retrained plaintiff regarding police procedures during a motor vehicle stop.

On June 21, 2018, plaintiff conducted a random registration inquiry of a parked vehicle, which revealed the vehicle owner had a suspended driver's license. A man and woman subsequently entered the vehicle, which the woman began to drive. Plaintiff followed the vehicle.

As he followed the vehicle, plaintiff requested a warrant search for the registered owner, a violation of BPD procedures. BPD Telecommunicator

A-0490-22

Edward Kneisler ignored plaintiff's request and reported the matter to Fingeroth. After plaintiff observed a motor vehicle offense, he stopped the vehicle. During the stop, plaintiff questioned the male passenger, who admitted he was the registered owner. Based on this disclosure, plaintiff advised the passenger he was under arrest.[1] Plaintiff subsequently allowed the arrestee to reenter the running vehicle without handcuffing him in violation of BPD policy. Plaintiff's actions compromised his safety and that of his backup officer, who reported the incident to Fingeroth. Ultimately, Fingeroth counseled plaintiff on officer safety and warrant look up procedures.

On September 12, 2018, while plaintiff was completing unrelated paperwork at BPD headquarters, other officers responded to a call involving a man identified as D.M. Although he was not involved in the call, plaintiff approached the dispatch desk and requested a search for warrants on D.M. The dispatcher subsequently advised Sergeant DeLeon of plaintiff's lookup request. DeLeon advised the dispatcher to decline plaintiff's request. DeLeon thereafter counseled plaintiff and advised him not to involve himself in service calls to which he was not assigned.

---

[1] The basis for the arrest is not explained in the record.

A-0490-22

On October 16, 2018, a BPD sergeant and lieutenant advised Massey that plaintiff had submitted an investigatory report containing inconsistencies when compared to what they observed on plaintiff's dashboard video recording of an incident. Massey subsequently met with plaintiff and provided him the opportunity to revise his report. Massey counseled plaintiff on the importance of accurately completing investigatory reports.

In a separate incident, plaintiff conducted a motor vehicle stop. He called BPD headquarters and requested a canine unit to respond to the scene for additional investigation. Because plaintiff failed to articulate a sufficient factual basis for a canine search, DeLeon denied his request. When DeLeon spoke to plaintiff about the denied request, plaintiff said he "didn't think it should be [the supervisor's] call to deny or accept a" canine search request.

On July 29, 2018, BPD officers were dispatched to the Georgian Court Apartments for a reported motor vehicle accident involving two suspected stolen vehicles. Plaintiff was the first officer on scene. Upon his arrival, plaintiff began chasing a male he suspected was driving one of the vehicles involved in the crash. The basis for plaintiff's suspicion is not clear, given that the man was standing in a group of people distant from the vehicles upon plaintiff's arrival. The individual escaped but was recaptured later.

A-0490-22

Police Officer Masri was the second BPD officer to arrive on the scene. He observed two damaged vehicles and multiple civilians gathering, but did not see any police officer because plaintiff left the scene to run after the suspect. Fingeroth, Detective John Brown, Police Officer Daynel Ozorio, and Police Officer John Hwang subsequently arrived on scene, as did officers from the Teaneck Police Department. Plaintiff also returned to the scene after he lost sight of the suspect he was chasing. BPD officers were on-scene for several hours investigating the accident. During the investigation, several officers observed plaintiff being insubordinate toward Fingeroth.

Fingeroth ordered plaintiff to stand by and secure one of the vehicles. Plaintiff disregarded the order, leaving part of a possible crime scene unsecure and open to tampering by the civilians gathering in the area. Plaintiff later claimed he did not hear Fingeroth's order. Fingeroth, aware plaintiff did not secure the vehicle, did not subsequently again order him to do so.

During the investigation, one of the vehicles was identified as a rental car. After discovering the renter was a female resident of the Georgian Court Apartments, Fingeroth, Brown, Hwang, and plaintiff walked to her apartment. As they approached, plaintiff told Brown and Fingeroth that if he identified the male who he chased in the apartment, he would arrest him. In response,

Fingeroth advised plaintiff they "needed to conduct a full investigation and determine what occurred prior to just placing somebody under arrest [since i]t was an active investigation at that time."

When the officers found the renter of the car, Brown began to question her, while Fingeroth, Hwang, and plaintiff stood by. As a result of Brown's questioning, the renter's boyfriend was identified as the driver of the rented car. The boyfriend was in the apartment and plaintiff identified him as the male he chased.

Plaintiff stated several times he wanted to place the male under arrest. Hwang, who was standing next to plaintiff, recalled plaintiff openly questioned why they were not arresting the male and audibly disclosed sensitive information about the potential arrest.

Fingeroth told plaintiff multiple times to stop speaking and advised him they were still conducting the investigation. Fingeroth ordered plaintiff to allow Brown to complete his interview. Plaintiff disregarded Fingeroth's orders and continued expressing his desire to arrest the male until Fingeroth firmly ordered him to stop speaking.

The officers subsequently walked back to the accident scene and continued the investigation. It was determined neither vehicle was stolen.

13

Masri, the primary officer investigating the scene, and Fingeroth decided the incident would be treated as a simple motor vehicle accident and not an arrestable offense.

Immediately thereafter, plaintiff began publicly verbally disagreeing with the decision not to arrest the male and questioning Fingeroth about the basis for the decision. This resulted in plaintiff and Fingeroth engaging in a loud verbal dispute in front of other BPD officers, the Teaneck officers, civilians, and the male whom plaintiff wanted to arrest.

During the public dispute, Fingeroth reminded plaintiff, based on BPD standard procedures, it was Masri's decision how to handle the investigation. Fingeroth advised plaintiff if he charged the male for fleeing the scene, plaintiff would be responsible for documenting the entire incident, including the motor vehicle accident, not just the male fleeing the scene. Plaintiff publicly disagreed with Fingeroth and contested the need for him to document the accident if he arrested the male.

Masri tried to quietly advise plaintiff he would be proceeding with the investigation solely as a motor vehicle accident. Masri told plaintiff if he was unhappy with the ultimate charging decision, they could discuss it further upon returning to headquarters. Plaintiff called Fingeroth over to where he and Masri

A-0490-22

were speaking and continued to express his disagreement with the charging decision. Fingeroth ordered Masri and plaintiff to jointly decide how to conclude the investigation. Ultimately, Masri and plaintiff agreed Masri would be the primary officer on the call and the male would not be arrested.

Several hours later, at BPD headquarters, plaintiff sought out and met with Fingeroth about the investigation. During the meeting in Fingeroth's office, Fingeroth attempted to explain his rationale for the way the investigation was conducted. Plaintiff disagreed with Fingeroth's explanation and began a loud verbal dispute that was overheard by Telecommunicator Carmelia Russo. Russo later advised an Internal Affairs (IA) investigator she heard plaintiff "yelling at Fingeroth." Fingeroth terminated the meeting and asked plaintiff to leave his office.

Later that day, Hwang, Ozorio, Masri, Russo, and Kneisler approached Fingeroth at separate times and expressed concerns about plaintiff's behavior. Fingeroth advised each of them, if they had an issue with plaintiff's actions, they should express their concerns in writing. On or about August 2, 2018, Hwang and Ozorio forwarded written reports to Fingeroth detailing their concerns about plaintiff's public actions, demeanor, and insubordination toward Fingeroth during the Georgian Court Apartments incident.

15

A-0490-22

On August 6, 2018, Fingeroth submitted a three-page special report, along with the written reports of Hwang and Ozorio to Brown, his direct supervisor. Later that day, Brown notified Massey of plaintiff's alleged insubordination, attaching the three written reports to his transmittal email.

Massey thereafter requested Madalone open an IA investigation into plaintiff's actions during the Georgian Court Apartments incident. Pursuant to BPD policy and the Attorney General's IA policy, insubordination was a major disciplinary violation, subjecting a police officer to progressive discipline up to and including termination. Madalone approved the investigation, which Massey then assigned Duran to conduct.

During an interview with Duran, Sergeant Ramos, and the PBA President, plaintiff admitted acting improperly at several incidents. For example, with respect to the Georgian Court Apartments motor vehicle accident, plaintiff conceded he "had no excuse" for his behavior and "should have done things differently." He also admitted using profanity towards civilians and acknowledged that type of behavior was "something [he had] been struggling with."

On December 6, 2018, Duran issued a report concluding plaintiff violated thirteen BPD rules and was insubordinate to Fingeroth on July 29, 2018. In

16

support of his conclusion, Duran noted plaintiff's failure to follow Fingeroth's orders at the accident scene and his comment to Fingeroth to "slow your roll" during the incident. Duran found plaintiff openly challenged Fingeroth's authority in front of numerous citizens, fellow BPD officers, and officers from another law enforcement agency. Additionally, Duran expressed concern about numerous false statements plaintiff made during his interview. He rejected plaintiff's claim his behavior should be excused because he was "still hyped up" during the incident.

On December 10, 2018, Massey submitted a memorandum to Madalone setting forth Duran's findings and recommending plaintiff's termination. Massey began drafting his memorandum before receiving Duran's report based on periodic updates he received from Duran during the investigation. Massey reviewed the dashboard camera recording, IA interrogatory responses, and plaintiff's video-recorded interview with IA investigators.

Massey characterized plaintiff's behavior during the Georgian Court Apartments incident as highly agitated, hyperactive, confrontational with other officers, and insubordinate to his supervisor. He believed plaintiff jeopardized fellow officers and the public. Massey also noted the recurring discrepancies

17

within plaintiff's investigative reports, including an incident where plaintiff's report was contradicted by events he later recounted in his IA interview.

Madalone reviewed Massey's report and the dashboard video of the Georgian Court Apartments incident and considered plaintiff's other corroborated performance deficiencies. She decided to terminate plaintiff. She concluded plaintiff was insubordinate, displayed inappropriate demeanor and judgment, did not work well with his supervisors and fellow officers, and had difficulty interacting with members of the public. Madalone testified that, while none of the noted incidents would independently warrant plaintiff's termination, they cumulatively supported his termination. On December 13, 2018, Madalone terminated plaintiff.

On July 19, 2019, plaintiff filed a complaint in the Law Division alleging his termination violated CEPA. Plaintiff claimed he was terminated in retaliation for the complaints he raised while a recruit at the Academy.

After discovery, defendant moved for summary judgment. On October 7, 2022, the court issued an oral decision granting the motion. The court found there was no dispute plaintiff was a probationary employee at the time of his termination and defendant had the authority to terminate him without cause. The court found plaintiff failed to produce any direct or circumstantial evidence

A-0490-22

establishing his termination was in retaliation for the complaints he made while a recruit at the Academy more than a year earlier. To the contrary, the court found the record contained evidence of repeated instances of insubordination and violations of defendant's procedures by plaintiff during his probationary period as a police officer, justifying his termination.

The court found plaintiff's complaints about overtime and conditions at the Academy were remote and attenuated from the incidents on which defendant relied to terminate plaintiff during his working test period. The court noted plaintiff withdrew his complaint seeking overtime compensation after speaking with Madalone and his anonymous complaint involved the BCSO, not BPD employees. An October 7, 2022 order memorialized the court's decision and dismissed the complaint with prejudice. This appeal followed.

Plaintiff argues the motion court erred because there are disputed issues of material fact with respect to whether a causal connection exists between his whistle-blowing activity and his termination, including whether: (1) Madalone, Massey, and Duran knew plaintiff wrote the anonymous letter about the Academy; (2) plaintiff was subjected to disparate treatment and terminated for conduct for which other officers were not disciplined; and (3) defendants' justifications for his termination were a pretext for retaliation.

19

We review a grant of summary judgment de novo, applying the same standard as the motion court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the motion court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

Self-serving assertions that are unsupported by evidence are insufficient to create a genuine issue of material fact. Miller v. Bank of Am. Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015). "Competent opposition requires 'competent evidential material' beyond mere 'speculation'

and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009). We review the record "based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523-24 (1995).

The purpose of CEPA is to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). "CEPA is a remedial statute that 'promotes a strong public policy of the State' and 'therefore should be construed liberally to effectuate its important social goal.'" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431).

In pertinent part, CEPA provides:

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses . . . to a supervisor . . . an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; [or]

21

. . . .

c.     Objects to . . . any activity, policy or practice which the employee reasonably believes:

(1)     is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or;

. . . .

(3)     is incompatible with a clear mandate of public policy concerning the public health, safety or welfare . . . .

[N.J.S.A. 34:19-3(a)(1), (c)(1) and (3).]

Prohibited retaliatory action includes terminating an employee. N.J.S.A. 34:19-2(e); Donelson v. DuPont Chambers Works, 412 N.J. Super. 17, 29 (App. Div. 2010), rev'd on other grounds, 206 N.J. 243 (2011).

To establish a CEPA violation, a plaintiff must demonstrate that:

(1)     he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

(2)     he or she performed a "whistle-blowing" activity described in [N.J.S.A.] 34:19-3(c);

(3)     an adverse employment action was taken against him or her; and

(4)     a causal connection exists between the whistle-blowing activity and the adverse employment action.

22

[Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015).]

If a plaintiff establishes the statutory elements, the burden shifts back to the defendant to "advance a legitimate, nondiscriminatory reason for the adverse" employment action. Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005). "If such reasons are proffered, [the] plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Id. at 39.

Defendant concedes plaintiff produced sufficient evidence to overcome summary judgment with respect to the first three prongs of the Lippman test. However, defendant argues the motion court correctly concluded plaintiff did not create a genuine issue of material fact with respect to the fourth prong: whether a causal connection exists between his whistleblowing activity and his termination. We agree.

Causation "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995). Such evidence may include "[t]he temporal proximity of employee conduct protected by CEPA and an adverse employment action." Maimome v. City of Atl. City, 188 N.J. 221, 237 (2006). However, "the mere fact that [an] adverse employment action occurs

23

after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (alterations in original) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). "Where the timing alone is not 'unusually suggestive,' the plaintiff must set forth other evidence to establish the causal link." Ibid. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000)).

Plaintiff's whistleblowing activity took place more than fifteen months prior to his termination. The absence of temporal proximity undermines plaintiff's claim of retaliation and heightens his obligation to identify evidence of a causal connection between the two events. Plaintiff's suspicion of retaliation alone is insufficient to overcome summary judgment.

While it is undisputed Madalone and Massey, the two decision makers, were aware of plaintiff's request for overtime while he was at the Academy, nothing in the record connects that request to his termination. Madalone addressed plaintiff's overtime request with him directly, offering to pay him overtime, but alerting him to the fact that he also would not be paid for the hours he did not work when released early from the Academy. Plaintiff withdrew his request. Plaintiff identified no evidence his inquiry about overtime hours

remained a concern at BPD or that the decision makers retained retaliatory animus toward him for more than a year over the request.

Nor did plaintiff identify any evidence Madalone and Massey knew he was the author of the anonymous letter. While the record contains evidence suggesting he was identified at BPD as the suspected author of the letter, plaintiff produced no evidence that those suspicions were confirmed. In addition, plaintiff suffered no adverse employment action at the time the letter was sent to BCPO, during the ensuing investigation, or when a decision was made to take no action. Again, plaintiff produced no evidence Madalone or other supervisors retained a retaliatory animus toward him for more than a year based on their suspicion he drafted the letter. To the contrary, his superior officers, including Madalone, commended plaintiff on several occasions for the positive aspects of his performance during his working test period. Plaintiff points to no evidence creating a genuine issue of material fact with respect to whether the termination decision was a retaliatory response to the anonymous letter.

Because plaintiff has not established a genuine issue of material fact with respect to the existence of a causal connection between his whistleblowing activity and his termination, entry of summary judgment in favor of defendant

25

was warranted. In light of our decision, we need not determine if plaintiff raised a genuine issue of material fact with respect to whether the basis for his termination was pretextual.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-0490-22